**STATE of Missouri, Respondent,**

v.

**Mark D. SHANZ, Appellant.**

**No. 14419.**

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 22, 1986.

Motion for Rehearing or Transfer
Denied Sept. 9, 1986.

Application to Transfer Denied
Oct. 14, 1986.

Janet M. Thompson, Columbia, for appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Chief Judge.

A jury found Mark D. Shanz ("defendant") guilty of manslaughter, § 565.005, RSMo Cum.Supp.1982,[1] and guilty of two counts of assault in the second degree, § 565.060, RSMo Cum.Supp.1983. The jury assessed punishment of ten years' imprisonment for the manslaughter, and five years' imprisonment for each of the assaults. The trial court imposed those sentences, ordering that they run consecutively. § 558.026.1, RSMo Cum.Supp.1983.

Defendant appeals, briefing two assignments of error. The first complains that the trial court erred in denying defendant's request for a mistrial when the assistant prosecuting attorney, during voir dire of the prospective jurors, stated that defendant "may or may not present evidence." The second avers that the trial court wrongly received in evidence a rifle that "had no connection to the events" whence the charges arose. Inasmuch as the sufficiency of the evidence to support the verdicts is unchallenged, we summarize only such testimony as is necessary to rule the assignments of error.

The main participants in the tragedy that culminated in this appeal were (a) Carolyn Sue Wise ("Carol"), (b) her husband, Elmer, (c) Harold Maggard, Junior ("Junior"), a cousin of Carol's, (d) Steven Hammock ("Hammock"), a nephew of Elmer's "by marriage," (e) Sharon Deckard ("Sharon"), a close friend of Carol's, (f) defendant, and (g) defendant's wife, Connie.

On Friday evening July 20, 1984, some time around 10:45, Carol, Elmer, Junior, Hammock, Sharon, and a few other people were in the backyard of Carol's and Elmer's home, 1516 West Division, in Springfield. They were talking, and some were drinking beer.

Defendant and his wife were inside their residence at 1510 West Division, the next house east of the Wise residence.

What occurred next was described at trial by five witnesses: Junior, Hammock, Sharon, defendant, and one Robert L. Gruenwald, a passerby who was unacquainted with any of the participants. Some of the accounts were fragmentary, and, as one would expect, there were substantial conflicts between some of the narratives.

Defendant recounted that his dog was barking, so he turned on his back porch light to see why. According to defendant, someone in the Wises' yard yelled, "[T]urn off that light you sorry son of a bitch."

Defendant reacted by picking up a "club" and going outside, where, according to his testimony, he saw a number of people in the Wise yard. At that juncture, said defendant, he announced, "[Y]ou all don't tell me what to do with my damn porch lights, all I want you all to do is leave me alone, keep your cars out of my yard."

At that point, testified defendant, Elmer came running toward him with a knife in his right hand, saying, "I'll just kill you, you son of a bitch." Simultaneously, recalled defendant, a female voice yelled, "[C]ut him, Elmer, cut him."

Contrary to defendant, Sharon testified Elmer had nothing in his hands.

When Elmer got within defendant's reach, defendant struck Elmer on the head with the club. A melee ensued.

Gruenwald testified that a shirtless, heavyset man (inferably defendant) ran from 1516 West Division to 1510, pursued by four or five people. This coincides with defendant's testimony that after striking

---

1. Section 565.005, RSMo Cum.Supp.1982, was repealed by Laws 1983, H.C.S.S.C.S.S.B. 276, §§ 1 and A., p. 923 and 931, effective July 1, 1984. The effective date of the repeal was changed to October 1, 1984, by Laws 1984, S.C. S.S.B. 448, § A, p. 757.

Elmer with the club, he (defendant) was "jumped on" by "several people." After some "serious fighting," defendant, so he said, was able to flee across his front yard, his attackers in pursuit.

Carol, according to defendant, took a brick off defendant's porch. Simultaneously, said defendant, Elmer struck him with a club.

As the other pursuers endeavored "to move in closer," defendant recalled someone yelling, "[G]et out of my yard." Upon hearing that, said defendant, he turned and saw Connie step from his house onto the porch, a rifle in her hand.

This, according to defendant, distracted his pursuers, and he ran to the porch beside Connie. At that point, explained defendant, he saw Elmer, Carol, and "a group of people" approaching the porch, so he (defendant) "grabbed the rifle from my wife and turned and fired."

Gruenwald's account of this aspect of the case was that defendant took the rifle from Connie, aimed it at a "shorter person" in front of the porch, and shot.

The bullet struck Carol in the left eye, separated the "midbrain" from the upper part of the brain, fractured the posterior aspect of the skull, and lodged beneath the scalp. The wound was fatal.

Then, according to Gruenwald, defendant crossed his yard, went to the Wise residence, and stepped onto the porch. Gruenwald saw defendant approach the front door, look inside, and begin shooting into the house through a door window. Asked how many shots were fired, Gruenwald responded, "I would think a minimum of four times, I wasn't counting."

Gruenwald then departed to summon police.

Hammock testified that after the fight broke out, he "got hit in the head," which left him "pretty well dazed." Some time thereafter he reached the front porch of the Wise house and "tried to make it through the front door." At that time, said Hammock, he felt a "numbness" in his hip.

Then, so he said, he entered the house, whereupon he felt "a sharp pain in my back, and I fell." Asked if he said anything when that occurred, Hammock responded, "Yes, I'd been shot."

Hammock recalled trying to crawl into the kitchen. He explained, "I couldn't move very well, I was bleeding quite a bit."

Sharon testified she saw defendant enter the house, stand over Hammock, and shoot him in the chest.

Junior testified that after the "commotion" began, he ran from the Wise property, but eventually returned via an alley and entered the house through the back door. Asked what he saw, Junior replied, "Well, [Hammock] was hollering 'I've been shot' and I was going towards him and I got shot." Junior denied seeing the person who shot him. He did, however, recall someone saying, "[Y]ou SOB's ain't so tough, are you." The next thing Junior remembered, so he said, was awakening in the hospital.

Sharon testified she saw defendant shoot Junior through the back doorway.

Defendant admitted shooting Junior, but insisted that he did so in his front yard, immediately after he shot Carol. Then, said defendant, he ran to the Wises' porch, looked inside through a window, and heard two shots.

"Glass flew out at me," said defendant, so "I returned fire back into the window." Defendant denied entering the Wises' house.

Hammock testified that two bullets were removed from his back, and that bullet fragments remained in his chest at time of trial. He was hospitalized 21 days.

Junior testified that his gunshot wound required the surgical removal of "one of my kidneys, part of my colon and my appendix." He was hospitalized initially for one week, released, and, a short time later, hospitalized another week.

Carol's death was the basis, of course, for the manslaughter conviction. The shootings of Hammock and Junior, respec-

tively, were the bases of the assault convictions.

■ Defendant's first assignment of error pertains to the following narrative by the assistant prosecuting attorney during voir dire of the veniremen:

"The burden is on the state to prove the defendant guilty and we willingly accept that burden, as we do in all cases, and in this case. Judge Appelquist has given you an instruction about reasonable doubt in the first instruction. Is there anyone who disagrees with that burden of proof?

Apparently not.

The defendant may or may not present evidence, that is up to the defendant to decide when the state finishes its case in chief. It is not for me to tell you or for them to decide at this point. All that they may—"

At that point, defense counsel[2] requested, and received, permission for a side-bar conference, during which he registered the following protest:

"Your Honor, it is fairly clear that the prosecutor has no right to comment on the presentation of evidence by the defendant. Whether we do or not or even to comment on it. It is our choice or will, we have a right to make that decision. The defendant will bring it up during the course of the trial. I realize that evidence—again, that is a choice that is left up to us. I am going to ask the jury be—or the panel be instructed to disregard that remark from the prosecutor. I feel it is incumbent on me in my case, and we feel at this time whether we will or will not present evidence is a decision—this is a very critical issue and I feel any comment on it by the prosecutor before we have opened it up is prejudicial to the jury."

The trial court indicated the objection would be sustained, whereupon defense counsel stated that the panel had been "tainted," and that he was requesting a mistrial.

The trial court denied the request for a mistrial, but cautioned the jury to disregard "any comment of the State or any remark of the State concerning the defendant's right to testify or the defendant's right to put on a defense."

Contending the denial of a mistrial was error, defendant's first point states:

"The trial court erred in overruling [defendant's] request for a mistrial during voir dire because the State's comments that the defendant may or may not present a defense were in derogation of [defendant's] right not to testify guaranteed by the fifth amendment to the United States constitution and article I, section 19 of the Missouri constitution, and were in contravention of section 546.-270, RSMo 1978 and Missouri Supreme Court rule 27.05(a) in that the State's comments referred to the defendant's right or failure to testify and thus irreparably tainted the jury panel."

Careful study of defense counsel's objection at trial reveals that the gist of the complaint was that the prosecutor had commented on "the presentation of evidence by the defendant." There was no accusation by defense counsel that the prosecutor had referred to defendant's right not to testify.

The trial court, however, evidently inferred that defense counsel was endeavoring to complain that the prosecutor had made reference to defendant's right to decline to testify. This is manifest from the trial court's admonition to the jury, mentioned above. Consequently, we shall assume, *without deciding*, that defense counsel's objection at trial was sufficient to preserve the point tendered on appeal.

U.S. Const., amend. V, provides that no person shall be compelled in any criminal case to be a witness against himself. Mo. Const., art. I, § 19, provides that no person

**2.** The attorney representing defendant on appeal is not the attorney who represented him at trial.

shall be compelled to testify against himself in a criminal cause.

Section 546.270, RSMo 1978, provides:
"If the accused shall not avail himself or herself of his or her right to testify, or of the testimony of the wife or husband, on the trial in the case, it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt, nor be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place."

Rule 27.05(a), Missouri Rules of Criminal Procedure (15th ed. 1984) is essentially the same as § 546.270.

The constitutional provisions mentioned above give defendant the right against self-incrimination, and the statute and rule mentioned above specifically forbid references by a prosecutor to an accused's failure to testify. *State v. Hill*, 678 S.W.2d 848, 850 (Mo.App.1984); *State v. Chunn*, 657 S.W.2d 292, 294[1] (Mo.App.1983). Both direct and indirect references are forbidden. *Hill*, 678 S.W.2d at 850[1]; *Chunn*, 657 S.W.2d at 294[2].

In determining whether a *direct* reference to an accused's failure to testify has been made, we look to see whether the words "defendant" or "accused" and "testify," or their equivalents, have been used. *Hill*, 678 S.W.2d at 850[3]; *State v. McNeal*, 517 S.W.2d 187, 188 (Mo.App. 1974).

To be an *indirect* reference, the comment must be the type that, when viewed in context, would cause the jury to infer that the remark referred to the accused's failure to testify. *Hill*, 678 S.W.2d at 850[4]; *State v. Reed*, 583 S.W.2d 531, 534[5] (Mo.App.1979).

Defendant cites six cases in which convictions have been reversed because of improper comments by a prosecutor. Those cases, with the offending comments, are set out below.

*State v. Lindsey*, 578 S.W.2d 903 (Mo. banc 1979): "Mr. Lindsey doesn't have to go forward with any evidence if he doesn't wish to. He doesn't have to take the stand if he doesn't want to—."

*State v. Ward*, 702 S.W.2d 545 (Mo.App. 1985): "The defendant can take the stand himself and testify about that."

*State v. Hinderman*, 665 S.W.2d 699 (Mo.App.1984): "... it's important to understand that you may only hear—okay?—the state's case; that the defendant does not have the burden to put on any evidence at all. He may choose not to. I can't call him to the stand, okay?"

*Chunn*, 657 S.W.2d 292: "How can you ... the defendant, explain a tire tool in the car."

*State v. Croka*, 646 S.W.2d 389 (Mo.App. 1983): "... you will hear testimony from several witnesses. I think there will be three, maybe four, testify for the State, and I anticipate the defendant will testify. And I anticipate, as I always do in a criminal trial, that the testimony from each side will conflict."

*McNeal*, 517 S.W.2d 187: "The court says in Instruction No. 7: You are further instructed you are to draw no inference whatsoever from defendant's failure to testify as a witness in this case; that is to say, that the defendant himself elected not to testify."

None of the above cases, in our view, are controlling here. In each of them, there was a clear and unmistakable reference to either the accused's right to testify, his right to decline to testify, or his failure to testify.

The instant case, in our judgment, is akin to *State v. Haggard*, 619 S.W.2d 44 (Mo. banc 1981), *vacated on other grounds*, 459 U.S. 1192, 103 S.Ct. 1171, 75 L.Ed.2d 423 (1983). There, the prosecutor, in his opening statement, said: "After all the evidence has been heard, and I assume there will be eight to ten witnesses called by the State, I do not know how many called by the defendant, if any." The accused's contention that this was an impermissible comment on his right not to testify was rejected. *Id.* at 47[6].

Of similar import is *State v. Terry*, 472 S.W.2d 426 (Mo. banc 1971), *vacated in*

*part,* 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972). There, the prosecutor, in his opening statement, said: "[t]hat, in effect, will be what the State's evidence will show after which time the defendant will be free to offer any evidence he chooses; after which time I will return...." The accused's assertion that this was an unfair comment on his right to remain silent and that it violated his right against self-incrimination was rejected. *Id.* at 430[6].

Attacks on similar statements in a prosecutor's closing argument have likewise been rejected. See *State v. Thompson,* 425 S.W.2d 80 (Mo.1968) where the prosecutor said: "At the close of the State's case the defendant had an opportunity to introduce any evidence he had, at that time he had the right—"; and *State v. Newman,* 391 S.W.2d 207 (Mo.1965), where the prosecutor said: "When the State closed its case the defense could have put on any evidence they wanted."

The prosecutor's comment in the instant case was no more egregious than those in *Haggard, Terry, Thompson* or *Newman.* Moreover, this is not a case in which defendant and his wife were the only possible witnesses (besides those called by the State) who could have testified about the events in issue. It was manifest that a number of other individuals were present when the episode occurred, and could have, at least theoretically, been called by defendant.

Defendant's first point is denied.

Regarding defendant's second point, the record discloses that after police arrived and secured the scene, search warrants were obtained for defendant's residence and the Wise residence. At trial, one of the police officers who conducted the searches identified Exhibit 24 as a .22 caliber rifle he seized in a bedroom in defendant's residence. The rifle, said the officer, was loaded when he found it. Then, this:

"Q ... Showing you what has been marked as State's 25, can you identify that?

A This was the second rifle taken from 1510 west Division.

Q Was it also loaded?

A Yes.

Q Did you remove the ammunition?

A Yes.

[Prosecutor]: Offer State's Exhibit 25.

[Defense Counsel]: May we approach the bench?"

At side-bar, defense counsel objected that Exhibit 25 was never "involved in any incident."

In response, the prosecutor stated that the officer was looking for a .22 caliber rifle, and found both rifles in defendant's house. According to the prosecutor, the officer had no idea which, if either, had been used by defendant. However, the prosecutor went on to reveal that his evidence would be that the "second weapon" (Exhibit 25) was "ruled out as the murder weapon."

The trial court overruled the objection, observing, "The rifle which is Exhibit 25 has already been seen for the past ten minutes before this objection came up."

The trial resumed and the officer was asked why he seized Exhibit 25. He answered, "I didn't know which rifle had been used, it was a weapon and I took it."

The State's evidence disclosed that a "30–30 rifle" and a ".22 automatic" were seized in the Wise residence. Defendant, of course, makes no complaint about that evidence.

A criminalist later testified that Exhibit 24 could have fired the bullet that killed Carol, and that no other weapon seized could have done so. The criminalist also testified that a bullet removed from Hammock by an attending physician had been fired by Exhibit 24.

Defendant's second point states:

"The trial court erred in admitting, over objection, a second .22 caliber rifle found in [defendant's] residence because the weapon had no connection to the events that transpired on July 20, 1984, and was thus irrelevant, and its admission into evidence inflamed and preju-

diced the jury in that the admission of the second weapon created the implication that [defendant] possessed a weapons arsenal and was a violent-tempered man who would shoot and kill without justification, thus tending to negate [defendant's] asserted defense."

The "asserted defense" referred to in the above point was self-defense.

Defendant directs our attention to the following excerpt from *State v. Charles,* 572 S.W.2d 193, 198 (Mo.App.1978):

"Lethal weapons completely unrelated to and unconnected with the criminal offense for which an accused is standing trial have a ring of prejudice seldom attached to other demonstrative evidence, and the appellate courts of this state have been quick to brand their admission into evidence, and any display of or reference to them during closing argument, as prejudicial error."

Defendant also cites *State v. Perry,* 689 S.W.2d 123, 125 (Mo.App.1985), where it is said:

"The courts of this state, with notable consistency, have recognized that weapons unconnected with either the accused or the offense for which he is standing trial lack any probative value and their admission into evidence is inherently prejudicial and constitutes reversible error."

To the same general effect are *State v. Smith,* 357 Mo. 467, 209 S.W.2d 138 (1948), and *State v. Moore,* 645 S.W.2d 109 (Mo.App.1982).

Given the well established principles mentioned above, we are astonished that the prosecutor in the instant case sought to place Exhibit 25 in evidence, knowing there was nothing in the State's case suggesting that Exhibit 25 was ever in defendant's or Connie's hands on the night in question.

The Attorney General, faced with the unenviable task of justifying, on appeal, the prosecutor's actions at trial, is reduced to arguing that because defendant was "randomly shooting" at various individuals, and the State was unable to account "for all of the shootings," it was somehow relevant to show that defendant "had these weapons available." This, however, overlooks the fact that all of the evidence was to the effect that defendant had only one rifle in his hands at the time all of the shots were fired, and that of the two rifles found in his residence, only Exhibit 24 could have fired the bullet that killed Carol and the bullet removed from Hammock. The only conceivable hypothesis under which Exhibit 25 could have been relevant would be if defendant, at some point in the fracas, and *after* shooting Carol and Hammock, had retreated to his home, discarded Exhibit 24, picked up Exhibit 25, and returned to the fray. We find absolutely no evidence to support any such theory.

■ Lest what we say be misunderstood, we find no fault with the police in seizing both Exhibit 24 and Exhibit 25. Not every item seized at a crime scene, however, is ultimately admissible in evidence. Once Exhibit 25 was ruled out as the weapon utilized by defendant, it ceased, *in the circumstances of this case,* to have any relevance. Its admission in evidence was, therefore, error.

■ It does not follow, however, that reversal is inevitable.

At the time the prosecutor offered Exhibit 25 in evidence, the jurors had already been told by the police officer that Exhibit 25 was found in defendant's residence, and that it was loaded. Defense counsel remained mute while this was being explained. It was only when Exhibit 25 was offered in evidence that defense counsel objected. After the objection was overruled, the only thing the jurors learned that they did not already know was that the officer seized Exhibit 25 because he did not know which rifle had been used.

Our examination of the transcript fails to reveal any further use by the prosecutor of Exhibit 25. It was evidently not referred to in the prosecutor's final argument, as defendant has failed to include the argument in the transcript. We assume that if the prosecutor had endeavored to exploit

Exhibit 25 in final argument, defendant would have supplied us that segment of the record.

If evidence is improperly admitted, but other evidence before the court establishes essentially the same facts, there is no prejudice and no reversible error. *State v. Zagorski*, 632 S.W.2d 475, 478 n. 2 (Mo. banc 1982); *State v. Garrette*, 699 S.W.2d 468, 503[47] (Mo.App.1985). That rule applies here. The receipt of Exhibit 25 in evidence, and the officer's explanation of why he seized it, added nothing prejudicial to what the jurors had already learned before defense counsel's objection, and the prosecutor, so far as the record shows, made no prejudicial use of Exhibit 25 thereafter.

Defendant's second point is denied.

Judgment affirmed.

TITUS, J., concurs.

GREENE, P.J., concurs and files concurring opinion.

GREENE, Presiding Judge, concurring.

Like Judge Crow, I am deeply concerned regarding the admission into evidence, over objection, of a loaded rifle that had absolutely nothing to do with the crimes in question.

Prosecutorial overkill has no place in the orderly administration of justice, and, in many instances, results in reversal of criminal convictions that otherwise would not happen. In this case, however, the horse was already out of the barn before defense counsel closed the door, in that the police officer who had discovered it in defendant's home had already identified it in the presence of the jury, before defense counsel made any objection concerning the weapon.

When you couple that circumstance with the fact that evidence of defendant's guilt on the three charges was more than sufficient to sustain the verdicts, I fail to see where the error was prejudicial.