**STATE of Missouri, Respondent,**

v.

**Hosea J. EDWARDS, Appellant.**

**No. WD 56953.**

Missouri Court of Appeals,
Western District.

Aug. 22, 2000.

Motion For Rehearing and/or Transfer to
Supreme Court Denied Oct. 3, 2000.

Application for Transfer Denied
Dec. 5, 2000.

Marc R.H. Joseph, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Krista D. Boston, Asst. Atty. Gen., Jefferson City, for respondent.

Before Presiding Judge HAROLD L. LOWENSTEIN, Judge LAURA DENVIR STITH and Judge THOMAS H. NEWTON.

LAURA DENVIR STITH, Judge.

Hosea Edwards was convicted of first-degree assault and armed criminal action for stabbing his girlfriend with a knife, and was sentenced as a prior and persistent offender to seven years imprisonment for first-degree assault and fifteen years imprisonment for armed criminal action. On appeal, he argues that the trial court committed reversible error in admitting a tape and transcript of the victim's 911 call for help into evidence, as it was admitted for its truth despite the fact that it contained hearsay identifying Defendant as the assailant, and allegedly did not fit within any hearsay exception. Defendant also argues that the court erred in permitting the State to introduce two knives found at the scene into evidence despite the fact that neither was directly connected to the stabbing of the victim.

We find that the 911 tape and transcript themselves were properly qualified as business records, and that the content of the 911 tape was admissible for its truth under the excited utterance exception to the hearsay rule. We further find that the admission of the knives found by the police at defendant's and the victim's home shortly after the crime was not reversible error despite the failure of police to definitively tie them to the crime. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Viewed in the light most favorable to the verdict, the following evidence was adduced: At approximately 2 a.m. on November 15, 1997, a woman placed a 911 emergency call to the Kansas City, Missouri Police Department. In an excited voice and while trying to regain her breath, her conversation with the 911 operator was as follows:

911 OP: 911, dis-

Caller: I need the, I need the police at 3924 Forest. I need an ambulance.

911 OP: What's going on?

Caller: I've been cut.

911 OP: Who cut you?

Caller: Uh, Hosea Edwards.

911 OP: Okay. Is he still there?

Caller: Yes, he is.

911 OP: Okay, what does he look like?

Caller: He's about 5'8", 5'9".

911 OP: What's he wearing?

Caller: Right now he's wearing underwear. And uh-

911 OP: Okay, what's your name, ma'am?

Caller: Lily Haney.

911 OP: Okay. Is that a house or an apartment?

Caller: It's a house. 3924 Forest.

911 OP: Okay. What's your phone number there?

Caller: 561-[XXXX]

911 OP: Okay, we'll get officers and paramedics out there.

Caller: Thank you.

Within three minutes after learning of the 911 call, Officer Brian Hayes and two other Kansas City, Missouri police officers arrived at 3924 Forest, the address given in the 911 call. A woman was standing on the front porch. The officer was asked at trial whether the woman had identified herself as Lillie Haney, but an objection to this question based on hearsay was sustained. However, the officer was permitted to testify that the woman was waiting for them on the porch of the house indicated in the 911 call and that she told the officers that she had been cut. Officer

Hayes saw a four-by-six inch cut on her left shoulder which he described at trial as "deep and open" but not bleeding. He also observed a small laceration to the palm of her right hand and swelling over her right eye. When asked at trial what her demeanor had been when the officers arrived, Officer Hayes testified as follows:

Officer: She was – for the seriousness of her injury, she was pretty calm and calm with us as far as trying to help.

Counsel: So she was cooperative?

Officer: Yeah. She was cooperative.

Counsel: And was she upset or?

Officer: She was upset. She wasn't irrational, distressed, not cooperating with us. She was able – letting us do our job.

Counsel: Okay. And was she – when she was talking, what was her voice like?

Officer: It was calm. It wasn't irrational.

Counsel: Okay. Was it loud?

Officer: Yeah. It was loud. It was loud.

When the ambulance arrived, one officer remained with the victim, while Officer Hayes and the other officer entered the house and went upstairs. They found only one other person in the house, a man. He was standing in the middle of one of the upstairs bedrooms. They put him in handcuffs and placed him in the patrol car, under arrest. He was identified as the Defendant, Hosea Edwards. Defendant later signed a waiver of his Miranda rights and gave a statement to police, in which he admitted that he had a verbal altercation with Ms. Haney that night, and admitted he had been very intoxicated and later had passed out. He said he had no memory of cutting her with the knife, but when he woke up he saw that she had been cut.

In the meantime, the ambulance attendants examined the victim and decided that she needed to be placed into the ambulance for immediate transport to the hospital because of the seriousness of her injuries. Officer Hayes followed the ambulance to the hospital. He took photographs of her injuries and spoke with her for about 15 minutes as she was being attended in the emergency room. The conversation took place about 40 minutes from the time that the police first arrived at the house. Officer Hayes was unable to testify as to much of his conversation with the victim because counsel for Defendant objected to the officer's repetition of most of her statements to him as hearsay. The officer did note that she gave him permission to search the house at 3942 Forest.

After talking with the victim, Officer Hayes and other officers returned to 3942 Forest and searched the premises. The detectives collected a variety of items with apparent blood spots on them, including two bed sheets, a pillow case, one roll of plastic trash bags, and an empty one-liter bottle of Pepsi. One of the detectives also saw a red streak that appeared to be blood on the right-hand side of the wall going up the second flight of stairs, and the detectives found apparent blood spots on the telephone in the bedroom where Defendant was found. They also found a silver-colored knife with a bent blade that appeared to have blood on it on the lower shelf of a coffee table in the living room, and took it. In the kitchen, the detectives found and collected a large kitchen knife with a black handle among other utensils and dishes in the sink. There was no blood on the kitchen knife. Neither of the knives was tested for fingerprints nor was any attempt made to match them with the laceration.

Defendant was charged with one count of first-degree assault in violation of Section 565.050 RSMo.1994 and one count of armed criminal action in violation of Section 571.015 RSMo.1994. Ms. Haney refused to testify at trial, invoking her Fifth Amendment privilege against self-incrimination, despite being subpoenaed by Defendant. Over defense counsel's objection, the State was permitted to introduce the 911 tape and a transcript of the tape at trial, based on the theory that the tape

was a business record and the statements on the tape fell within the "excited utterances" exception to the hearsay rule. The State was also permitted to introduce the bloody knife found in the living room and the kitchen knife found in the sink, over objections that they had not been tied to the victim's injuries since they had not been tested for fingerprints nor had the blood on the living room knife been tested to see whether it belonged to the victim.

The jury found Defendant guilty on both counts. He was sentenced as a prior and persistent offender to seven years imprisonment on the first-degree assault charge and fifteen years imprisonment on the armed criminal action charge. This appeal followed.

## II. STANDARD OF REVIEW

 We review the trial court's judgment " 'for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.' " *State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc 1996) (citation omitted). Our standard of review also recognizes that the trial court is "vested with broad discretion to admit evidence at trial and we will only reverse if this discretion was clearly abused." *State v. Morrow,* 968 S.W.2d 100, 106 (Mo. banc 1998). We review legal issues *de novo. State v. Tinoco,* 967 S.W.2d 87, 89 (Mo.App. W.D.1998); *State v. White,* 931 S.W.2d 825, 828 (Mo. App. W.D.1996).

## III. LEGAL ANALYSIS

*A. The 911 Call and Accompanying Transcript.*

 Defendant argues that the trial court erred when it allowed the 911 tape and the accompanying transcript into evidence because the statements on the tape were admitted for their truth, and thus constituted hearsay evidence. Defendant claims that the statements on the tape, and particularly the caller's identification of herself as Lillie Haney and of Defendant

as the perpetrator, were not admissible for their truth under the business records exception to the hearsay rule because the tape contained "hearsay within hearsay." And, Defendant argues, the hearsay contained in the 911 tape and transcript did not qualify for admission under any exception to the hearsay rule. We disagree.

As previously noted, the entire conversation between Ms. Haney and the 911 operator was as follows:

911 OP: 911, dis-

Caller: I need the, I need the police at 3924 Forest. I need an ambulance.

911 OP: What's going on?

Caller: I've been cut.

911 OP: Who cut you?

Caller: Uh, Hosea Edwards.

911 OP: Okay. Is he still there?

Caller: Yes, he is.

911 OP: Okay, what does he look like?

Caller: He's about 5'8", 5'9".

911 OP: What's he wearing?

Caller: Right now he's wearing underwear. And uh-

911 OP: Okay, what's your name, ma'am?

Caller: Lily Haney.

911 OP: Okay. Is that a house or an apartment?

Caller: It's a house. 3924 Forest.

911 OP: Okay. What's your phone number there?

Caller: 561-[XXXX]

911 OP: Okay, we'll get officers and paramedics out there.

Caller: Thank you.

 While, in his brief, Defendant seems to argue that the tape did not qualify as a business record, counsel conceded at argument, and we find, that the tape did qualify as a business record. A document qualifies as a business record if three conditions are met: (1) either the custodian of records or other qualified witness testifies to the identity and mode of preparation of the record; (2) the custodian or qualified

witness testifies that the record was made in the regular course of business, at or near the time of the act, condition or event: and (3) the court finds admission of the record is justified by the sources of information and the method and time of preparation of the record. Sec. 490.680 RSMo.1994. Here, because Detective Marks had knowledge of the business operations and methods of record-keeping for 911 calls in the communications unit of the police department, he was a qualified witness. *See, e.g., State v. Williamson,* 836 S.W.2d 490 (Mo.App. E.D.1992); *Interest of H.J.P.,* 669 S.W.2d 264 (Mo.App. S.D.1984) (in termination of parental rights case, DFS employee who identified and presented a report of the division's file was a qualified witness under Sec. 490.680). In addition, Detective Marks testified that, in its regular course of business, the police department's communications unit records all 911 emergency calls and the recordings are kept for a period of 90 days unless there is a request to keep a particular recording for a longer period. Based on this evidence, the trial judge did not abuse his discretion in finding the tape qualified as a business record. *Tebow v. Director of Revenue,* 921 S.W.2d 110, 113 (Mo.App. W.D.1996) ("The court's decision whether to admit the business records remains a discretionary determination of the trustworthiness of the records").

■ We agree with Defendant, however, that the business records exception does not, in itself, provide a sufficient basis for admission of the 911 tape or transcript. Where, as here, a document is offered to prove the truth of the matters stated in it, then "[e]ven if a document falls under the business record exception ... the document will not be admissible if the underlying statement is inadmissible hearsay." *State v. Sutherland,* 939 S.W.2d 373, 377 (Mo. banc 1997). Thus, we must determine whether an exception to the hearsay rule applies to the 911 tape.

■ The State argues, and the court below apparently found, that the statements made by Ms. Haney on the 911 tape constitute excited utterances and thus are admissible under the excited utterances exception to the hearsay rule. We agree. The essential test for admissibility of an excited utterance is whether it was made under such circumstances as to indicate it is trustworthy. The rationale of this exception to the hearsay rule is that, if the statement is made under the immediate and uncontrolled domination of the senses as a result of the shock produced by an event, the utterance may be taken as expressing the true belief of the declarant. *State v. Van Orman,* 642 S.W.2d 636, 639 (Mo.1982) (citations omitted). *See also, State v. Dunn,* 821 S.W.2d 512, 515 (Mo. App. W.D.1991). "The utterance must be made under the immediate and uncontrolled dominion of the senses and during the time when consideration of self-interest could not have been brought to bear through reflection or premeditation." *State v. Post,* 901 S.W.2d 231, 234 (Mo. App. E.D.1995).

Defendant argues that these requirements are not met here because no evidence was introduced as to the time that had elapsed between the attack on Lillie Haney and her 911 call, and the officer testified that when he arrived at her house 3 minutes after the 911 call was made, her cut was not bleeding. While we agree that this was relevant evidence for the judge below to consider, we do not agree that it precluded the court from finding that the excited utterance exception applied. Our Supreme Court has previously held that "[t]he temporal proximity between the event and the statement need not be simultaneous so long as the statement is provoked by the excitement of the event and apparent spontaneous influence of the occurrence acting on the senses of the speaker in which case it can qualify as an exception to the hearsay strictures." *State v. White,* 621 S.W.2d 287, 295 (Mo.1981).

Here, while the record does not reveal exactly how much time elapsed between the knifing and the 911 call, and while the

wound was not bleeding when the police arrived, there was substantial circumstantial evidence that the call occurred shortly after the knifing, and while the caller was still in a state of excitement as a result of being wounded. First, the tape of the 911 call itself demonstrates that the caller was not calm, but rather was catching her breath and speaking with emotion. Moreover, the caller did not immediately identify either herself or her assailant, but asked for an ambulance and police because she had been cut by a knife. She gave the operator her name and that of Defendant only in response to the 911 operator's questions.

Second, although Officer Hayes reported that Ms. Haney's left shoulder injury was not bleeding when he arrived, he later testified that because of the seriousness of her injuries, the paramedics, who arrived at about the same time he did, immediately loaded her into the ambulance for transport to the hospital. Third, Officer Hayes testified that in responding to the call, he found Ms. Haney waiting at her front door for the police to arrive. Fourth, Natalina Baldwin, of the Kansas City, Missouri Police Department's domestic violence unit, testified that when she saw Ms. Haney at the hospital at least 40 or so minutes after police originally came on the scene, and after Ms. Haney was treated, "all [her] wounds appeared fresh." Fifth, both Officer Hayes and Ms. Baldwin took photographs of the injuries, and those photographs were admitted into evidence without objection.

 Defendant argues that, even if the caller's statements would otherwise fall within the excited utterance exception, they cannot do so here because there is no proof that the caller was really Lillie Haney, as opposed to someone just claiming to be Lillie Haney, since she took the Fifth Amendment and refused to testify at trial as to whether she made the telephone call. In support, Defendant cites *U.S. v. Biondo*, 483 F.2d 635 (8th Cir.1973), for the proposition that "[a] telephone conversation is admissible provided the identity of the speaker is satisfactorily established." *Id.* at 644.

However, our courts have held that anonymity of the speaker is not a bar to admission of an excited utterance where the circumstances of the statement show trustworthiness. Thus, in *State v. Moss*, 627 S.W.2d 667 (Mo.App. W.D.1982), the defendant shot the victim in the back and an unknown man immediately said, "He's dead. You killed him. He's dead." *Moss*, 627 S.W.2d at 668. Mr. Moss complained that because of the failure to identify the unknown man, Mr. X., he was denied his Sixth Amendment right to confront him. However, the court found that "if evidence is within one of the recognized exceptions to the hearsay rule, the reception of that evidence does not violate the Sixth Amendment." *Id.* at 669. *See also, White*, 621 S.W.2d at 295.

Again, in *State v. Dunn*, 821 S.W.2d 512, the defendant challenged an officer's testimony regarding CB transmissions he heard while on patrol regarding a vehicle traveling southbound in the northbound lanes of I–29 less than fifteen minutes before defendant's car was found with defendant in the vehicle. Specifically, defendant claimed that the CB transmissions which were admitted for their truth were inadmissible hearsay because the identities of the declarants were unknown. However, the court considered that the officer did testify that the drivers travelling on the interstate were excited when describing in the CB transmission the actions of defendant's car and their determination as to his location was sufficiently close to where he was ultimately found. Thus, the evidence was found to support the conclusion that the CB transmissions which the officer testified about were excited utterances and that the consistent number of accurate reports from different declarants showed they had personal knowledge of defendant's activities, *and were trustworthy and admissible. Dunn*, 821 S.W.2d at 515–16

■■■■ As in the above cases, direct evidence confirming Ms. Haney's identity as the caller was not necessary for "anonymity is not fatal to the admissibility of the statements once the statements qualify within the exception." *Id.* at 516. Instead, the key to admissibility of an excited utterance is trustworthiness. *Post,* 901 S.W.2d at 234; *Dunn,* 821 S.W.2d at 515; *State v. Griffin,* 662 S.W.2d 854, 858 (Mo. 1983); *Van Orman,* 642 S.W.2d at 639; *Walsh v. Table Rock Asphalt Const. Co.,* 522 S.W.2d 116, 121 (Mo.App. S.D.1975). Moreover, even the *Biondo* case cited by Defendant notes that the identity of the caller may be shown by circumstantial evidence. *Biondo,* 483 F.2d at 644. Missouri law is in accord. *See, e.g., State v. Beaver,* 784 S.W.2d 871, 872 (Mo.App. E.D.1990); *State v. Gardner,* 743 S.W.2d 472, 473 (Mo. App. E.D.1987) (sufficient circumstantial evidence for jury to infer that defendant was the caller). *Beaver* noted that:

> Our Supreme Court has recognized that the subject matter of a phone call can serve as a circumstantial basis to show the identity of the caller. *Zimmerman v. Associates Discount Corporation,* 444 S.W.2d 396, 397 (Mo. banc 1969). In criminal cases, this rule has been used to identify the defendant as a participant in a telephone conversation when the defendant discusses facts which most likely only he would know. *See, State v. Deaver,* 6 Wash.App. 216, 491 P.2d 1363 (1971), 79 A.L.R.3d 79, 174–76 (1977).

*Id.* Comparing *Beaver* to the case at bar, Ms. Haney gave the address and telephone number of the house where the knifing occurred, she knew the man's name who was in the house – Hosea Edwards – she was also found waiting at the front door when the police arrived, and she had injuries identical to those described on the 911 tape. Additionally, on the same day that the 911 call was made, after treatment for her injuries, Ms. Haney went to police headquarters by her own effort to provide a statement to Officer Bell, and Defendant admitted he and Ms. Haney had been fighting and that, while he did not recall knifing her, when he woke up he found she had been knifed. This circumstantial evidence is more than sufficient to provide a basis for finding that it was indeed Ms. Haney who made the emergency 911 call on November 15, 1997.

For these reasons, we find that the tape was properly admitted under the excited utterance and business records exceptions to the hearsay rule.

### B. The Knives Found at the Scene

Defendant also argues that the court committed reversible error in permitting the State to introduce evidence that the police found and seized two knives from Ms. Haney's and Defendant's home when they searched it for evidence following the knifing. He argues that the State was required to show that the knives had a connection to Defendant or to the injury to the victim before they could be admitted, and that the State failed to meet this burden since it did not test the knives for fingerprints or test the blood on the knife found in the living room to determine whether it belonged to Ms. Haney. While we agree that the State did not do a very thorough job of explaining the connection of the knives to the crime, we do not find that their admission was prejudicial error on the facts of this case.

■■■■ As a general rule, physical evidence will be admitted if "it is relevant to a material matter at issue." *State v. Kreutzer,* 928 S.W.2d 854, 869 (Mo. banc 1996). Here, while no expert testified that either of the two weapons was the one which caused Ms. Haney's wound, Detective Marks was permitted to testify, without objection, how police found the weapons during a search of Defendant's and Ms. Haney's home. He explained that as they searched the house, they found a number of items with blood on them, and found blood smears on the wall by the stairs. They then found a small, bloody knife with a bent blade under the coffee table, and seized it because they believed it might be the weapon used by the attacker. They

continued searching and found a butcher knife in the sink. The Detective admitted that the butcher knife had no blood on it and was with other utensils and dishes in the sink, but explained that he seized it because he believed it might be the weapon used in the stabbing.

Defense counsel did not object to the officer's testimony about the knives. He objected only to introduction of the knives into evidence. The court overruled the objections in light of the State's argument that the knives were admissible because they were found at the crime scene and it appeared that they could have been used to cause the injury to the victim. Once admitted, the officers later explained that they could not determine whether or not the knives were used by Defendant to stab the victim by testing them for fingerprints, since Defendant lived in the home and his prints would be expected to be found on the knives. Defense counsel effectively brought out the weak connection of the knives to the crime, and the fact that the police did not really know which, if either, of the knives was the weapon used by the attacker.

Our Supreme Court addressed alleged error in admitting evidence of a knife in *State v. Taylor*, 701 S.W.2d 725 (Mo. banc 1985). The victim in that case was stabbed and killed in her home. Defendant, her husband, found the body and called the police. In the course of searching the crime scene, the police searched the kitchen and seized a knife found in a kitchen drawer some five hours after the stabbing. Expert testimony established that it could have been used to make the wounds, but there was no evidence showing that it had been used to make the wounds. Defendant argued that it therefore should not be admissible. *Taylor* held that:

> A weapon with which the crime might have been committed, found near the time and scene of the crime, is relevant to show the means by which the crime was committed. *State v. Dodson*, 642

S.W.2d 641, 642 (Mo.1982). 'Articles, instruments and weapons that have a tendency to explain the manner in which a crime was committed that are found at or near the scene of the crime subsequent to the commission of the crime are generally admissible.' *State v. Bolder*, 635 S.W.2d 673, 688 (Mo. banc 1982). *Id.* at 728. In *Bolder*, relied on in *Taylor*, the Supreme Court similarly found no error in admitting a knife into evidence despite the fact that it was not positively tied to the defendant or the crime where defendant was seen making stabbing motions over the victim and was later found in a building wiping blood off of his hands, and the knife was found in a room down the hall in the same building, without fingerprints but with blood on it of the same type as that of the victim.

In *State v. Ramsey*, 820 S.W.2d 663 (Mo.App. W.D.1991), this Court similarly ruled that no reversible error occurred in admitting evidence of a shotgun found at the house where a drug buy had occurred, where the evidence showed that a man had been holding a similar shotgun during the drug transaction in question three and one-half hours earlier, even though no evidence was introduced showing that it was the same weapon, stating:

> Weapons found at or near the crime scene or which tend to explain the manner in which a crime is committed are generally found to be admissible. *State v. Reyes*, 740 S.W.2d 257, 261 (Mo.App. 1987). Where the evidence in question tends to connect a defendant with the crime, proves the identity of the deceased, shows the character of wounds or throws light upon a material fact in issue, it is properly admissible.

*Id.* at 666. *See also, State v. Cuckovich*, 485 S.W.2d 16, 23 (Mo. banc 1972) (holding that it was not error to admit into evidence a gun which had the same characteristics as the murder weapon, but which could not be conclusively shown to be the murder weapon, which was found in a dresser of defendant's house, because it was shown to

be in the room where defendant was arrested and was similar to the murder weapon).

Here, as in the above cases, while neither knife was shown to have been the one used to stab the victim, both were found at the scene of the crime shortly after it occurred. One had blood on it, and the other was in the sink in water and the detectives reasonably could have thought that it might have been used to commit the crime and been placed in the sink to wash off the blood or conceal its presence. While, as we noted in *Ramsey* and in *State v. Perry*, 689 S.W.2d 123 (Mo.App. W.D. 1985), introduction of weapons unconnected with the crime and which lack any probative value has been held to be reversible error, we cannot say on these facts that the knives had no probative value or had no connection with the crime. Moreover, the only issue raised on appeal is whether the court erred in admitting the weapons in evidence as exhibits. Detective Marks was permitted to testify about finding the knives without objection, and in fact defense counsel questioned him about them, and argued their irrelevance, and allowed the State to argue their relevance without objection, and Defendant does not claim on appeal that this was error.

 In this circumstance, similarly to *State v. Shanz*, 716 S.W.2d 472 (Mo.App. S.D.1986), even if admission of one or both of the knives into evidence was erroneous, we are convinced that it could not have been prejudicial. In *Shanz*, the appellate court found that the trial court had erred in admitting evidence of a second gun found at defendant's residence, when other testimony clearly established that a different gun also found at the scene was the murder weapon. The court found the admission was not prejudicial, however, where defense counsel had permitted the prosecutor to question a witness about finding the gun at defendant's residence, and only objected when the prosecutor offered the gun into evidence. The prosecutor did not refer to the gun thereafter.

On these facts, the court found, no prejudice could have resulted from the erroneous admission of the gun, stating:

> If evidence is improperly admitted, but other evidence before the court establishes essentially the same facts, there is no prejudice and no reversible error. [citations omitted] That rule applies here. The receipt of Exhibit 25 in evidence, and the officer's explanation of why he seized it, added nothing prejudicial to what the jurors had already learned before defense counsel's objection, and the prosecutor, so far as the record shows, made no prejudicial use of Exhibit 25 thereafter.

*Shanz*, 716 S.W.2d at 479.

Here, as in *Shanz*, we cannot find that admission of the knives into evidence caused prejudicial error.

For all the reasons stated above, we affirm.

Presiding Judge HAROLD L. LOWENSTEIN and Judge THOMAS H. NEWTON concur.