

# In the
# Missouri Court of Appeals
# Western District

STATE OF MISSOURI,

          **Respondent,**

v.

DERRICK R. PATRICK,

          **Appellant.**

WD80777

OPINION FILED:

JANUARY 8, 2019

---

**Appeal from the Circuit Court of Boone County, Missouri
The Honorable Kimberly Jane Shaw, Judge**

**Before Division Four: Mark D. Pfeiffer, Presiding Judge,
Karen King Mitchell, Chief Judge, and Anthony Rex Gabbert, Judge**

Derrick R. Patrick appeals from a judgment convicting him of domestic assault in the third degree pursuant to Section 565.074, RSMo Cum. Supp. 2012. He asserts two points on appeal. First, he contends the circuit court abused its discretion in admitting and considering, over Patrick's objection, a 911 recording because it had no probative value and was not properly authenticated. Second, he contends that the circuit court abused its discretion in admitting and considering, over Patrick's objection, the portion of the body camera footage wherein Patrick made a statement to police regarding threats he made with a knife because it had no probative value, was not made in reference to the offense charged, and was highly prejudicial. We reverse.

**Factual and Procedural Background**

On November 7, 2016, the State charged Patrick with the class A misdemeanor of domestic assault in the third degree pursuant to Section 565.074, RSMo Cum. Supp. 2012. As relevant to the State's charge, Section 565.074 provides that "a person commits the crime of domestic assault in the third degree if the act involves a family or household member" and "the person purposely places such family or household member in apprehension of immediate physical injury by any means." Patrick was tried by the court on March 16, 2017. The following evidence was offered at the bench trial:

On November 7, 2016, Elizabeth Taylor[1] was working as a 911 operator and received a call around 7:30 a.m. The call was tape recorded and lasted fourteen minutes. At trial, the State offered the 911 tape into evidence. Patrick's counsel objected on hearsay, confrontation, and foundational/authentication grounds. The court allowed the 911 tape to be admitted but indicated that "there may be a limit on how far we get into the conversation based on [Patrick's] argument." Patrick's counsel indicated that there would potentially be other objections to the tape and stated, "I'm hoping – I'm hoping they redacted it out, but we shall see."

At the beginning of the call, the caller asked for police assistance and provided her address. She reported that the previous evening her son pulled a knife on her grandson and her son "still woke up drunk talking shit to me. I'm sixty-two years old. Get the police here now please!" Patrick's counsel objected stating, "She makes a statement in there that, 'My son just pulled a knife on my grandson.' That is not charged in the information. That is not relevant." Patrick's counsel

---

[1] Taylor's testimony consisted solely of introducing the recorded 911 tape. Defense counsel elicited on cross examination that, apart from the call itself, Taylor had no knowledge of or familiarity with the caller or any individuals named in the call.

argued the statement was highly prejudicial and being used as propensity evidence. The State argued that it was an excited utterance and that it went to the credibility of the later threat that occurred during the 911 call. The court sustained Patrick's objection.

Five additional objections were made by Patrick on what appears to be the same grounds as the State continued to play six minutes and forty seconds of the tape. The tape was stopped and started with each objection. The court sustained each of Patrick's objections. After Patrick's sixth objection, the State asked to skip to the portion of the tape the State wanted heard.

The transcription provided to this court on appeal provides no notations as to the content of the portions of the tape wherein objections were sustained. After trial, the State provided the court with notice that the State had admitted into evidence the 911 call starting from the inception of the call to six minutes and forty seconds into the call. However, the portions of the tape wherein objections were sustained were not noted and were not redacted in the tape provided to this court. We glean from the record that Patrick's objections regarded references to Patrick's alleged conduct the prior evening wherein Patrick was alleged to have threatened H.P.'s grandson with a knife. As Patrick was not charged regarding that alleged act and it is clear from the record that the court sustained Patrick's initial objection to that evidence, we presume the court excluded related information when sustaining Patrick's objections. Some of this information is referenced below in explaining the factual context of the 911 call and the police body camera evidence.

H.P. identified herself within the call as Patrick's mother and asked for police assistance due to Patrick's behavior. She stated that Patrick would get drunk and cause disturbances within the home. The 911 operator asked H.P. if the disturbance was physical or verbal. H.P. stated that it was verbal. When asked how many people were involved H.P. replied, "It's just my grandson." H.P. then told the operator that Patrick was calling someone else on his cell phone and that, "yeah,

3

he's going to jail and he's going to lose his job. He works at a day care center." H.P. stated that the knife involved, H.P.'s kitchen butcher knife, was laying on a dresser. H.P. calmly relayed that, while H.P. was on the phone with the operator, Patrick brought the knife to the kitchen and placed it in dishwater. H.P. asked the operator if she should take the knife out of the dishwater; the operator told her not to touch it.

H.P. provided Patrick's name, race, birthdate, and a description of the clothing he was wearing. The operator asked H.P. if she or anyone else was in immediate danger. H.P. replied, "No. My grandson is twenty. He's here because he came down here from Las Vegas because he has a court date Thursday, and my brother is staying here with me. But he's (referencing Patrick) an alcoholic, he drinks, he gets drunk, and that's when he starts all the 'offrontations.'"

Approximately five minutes and fifteen seconds into the call H.P. shouts, "He just threatened my life! He just said he is going to kill me!" A male voice can be heard in the background. H.P. firmly says to the operator, "Come and get him, please!" H.P. can then be heard talking with other people, telling them that Patrick had just threatened to kill her. She asks someone to call "Deanie" and tell him that Patrick just threatened to kill her. H.P. states with an angry tone, "Fu** this sh**." A male voice can be heard saying, "ain't gonna kill nobody." A male voice can be heard yelling, "I'm leaving!"[2] A male voice says something about the "police." H.P. asks the 911 operator in a calm voice, "Do you hear him?" The 911 operator states that she does and asks H.P. to separate herself from Patrick and avoid further contact if it is safe to do so. H.P. states calmly, "Yeah, I gotta throw my wig on my head. I gotta put my wig on my head." She

---

[2] The voice stating, "ain't gonna kill nobody" appears to be a different voice than the one mentioning the police and stating, "I'm leaving." The "I'm leaving" comment appears to be in response to the "ain't gonna kill nobody" statement.

then says, "Yeah, but he's gotta go to jail because he's not going to threaten to kill me. I'm sixty-two years old." H.P. then explains that Patrick had called "Deanie," H.P.'s brother, whom she stated was a good brother who transported both Patrick and H.P. back and forth from work. When the portion of the 911 tape entered into evidence by the State ended, H.P. had still not left the home and remained inside the home with Patrick.

The State introduced the testimony of Robert Smith, police officer with the Columbia Police Department. He testified that he responded to a domestic disturbance call the morning of November 7, 2016. He stated that he made contact with Patrick and H.P. upon arriving at their residence. Smith stated that when he spoke with H.P. she was upset and crying. Smith testified that he was wearing a body camera the day he was called to the home. The State offered the body camera footage into evidence. Defense counsel objected on the grounds that the video was "full of inadmissible testimony" that should have been redacted with the portion of video the State intended to present and disclosed to defense counsel. The State indicated that "we really just want to play an admission of the defendant during the course of this at around six minutes and thirty seconds." The State indicated that the statement involved Patrick saying, "The reason I threatened you all with a knife is because …." Defense counsel objected on the grounds that any information regarding a knife involved alleged misconduct with H.P.'s grandson the previous evening, and the charge before the court involved a threat made during the 911 call. Defense counsel argued that any "admission" by Patrick would have to be relevant to the offense charged – a threat made specifically to H.P. The court ruled: "I'm going to allow you to admit it just for that section and that purpose only and his statements. If there's something in there about a knife I'm not going to take that into consideration at all. But if there's something else, then just object like you've done before."

5

The portion of the body camera video admitted by the court shows Patrick stating to bystanders: "You got me f****d up. The reason I threatened y'all n*****s with a knife is because everybody wants to jump tough on me and I was one versus everybody else. And I'm not going out like that. Period." After the statement was played to the court, defense counsel again argued it referenced irrelevant and inadmissible alleged conduct from the prior evening. The State countered that it was relevant because H.P. stated on the 911 call that her son was threatening *to kill her*, and when the police showed up Patrick stated, "The reason I was threatening *to kill you all* …." The State argued that this was an admission by Patrick to the offense charged. Although the court questioned whether the threat referenced a knife rather than killing, the court ruled: "Okay. Well, at this point, I'm going to go ahead and allow that evidence."

After the footage was shown, the State asked Officer Smith: "Who was Mr. Patrick conversing with when he said the words 'the reason I threatened *to kill* you all'?" Smith testified, "I do not know for certain."

At the end of trial the court stated that it was taking the matter under advisement and asked the State to identify the time in the video wherein Patrick allegedly made the "incriminating statement."[3] The State indicated it would email that information to the court. Although the court asked only for the time frame of the "incriminating statement," approximately one week after trial the State notified the court that it believed the following portions of the body camera footage were admissible: "From inception of the footage to the 2 minute point/ From 5:55 to approximately

---

[3] The court states:

> Okay. I'm going to show that the matter is taken under advisement, but I would like to have Exhibit 1 and Exhibit 2. On Exhibit 1, I want to know what the time is on the statement by the defendant. And on Exhibit 2 – again … I want to know the time that he supposedly said he was going to kill her. On the video, I want the time of when he – the defendant supposedly made the incriminating statement.

6

6:45 minute/ from approximately 7:05 to 7:15 minutes." Although the State contends on appeal that all of this body camera footage was admitted at trial, it is clear from the record that only Patrick's ten to fifteen-second knife statement was admitted.[4]

"Appellate courts generally do not consider evidence outside the record on appeal." *Hedrick v. Director of Revenue*, 207 S.W.3d 675, 677 (Mo. App. 2006). Here, the entire 911 tape and body camera video were provided to this court in the record on appeal as the State never redacted information prohibited or not intended for admission by the State. We stress that we need not look beyond the portions of the exhibits admitted by the court to reach our determinations herein. However, in reviewing the exhibits provided to this court and noting the time frames therein the State avers were admitted, we are disturbed by the State's post-trial isolation of certain body camera footage to support the State's case while omitting context and footage favorable to Patrick.

The State contends the first two minutes of body camera footage were admitted by the court. Within this footage H.P. can be seen walking outside when police arrive. She is still on the phone with the 911 operator. She calmly states to the operator that the police had arrived and asks if she can terminate the call. H.P.'s brother explains to officers that they just want Patrick to leave the home and they are waiting on Patrick's ride. An officer suggests Patrick would be unable to leave, explaining this was a "domestic" call involving "mom and son or grandson and grandma." H.P. immediately states: "Yeah, he pulled a knife on him" and points to her grandson. H.P.'s

---

[4] It is clear from the record that, at trial, the State only requested to introduce the alleged "admission" by Patrick that begins six minutes and thirty seconds into the video and lasts approximately ten seconds. According to the record, only this portion of the footage was played for the court at trial. The email sent by the State included body camera footage beyond that introduced at trial and requested by the court. As the State never suggested at trial that this additional evidence would be admitted, thereby giving Patrick no opportunity to challenge it at trial and the court no opportunity to rule on any challenges, we find that it was never admitted.

brother indicates that the knife threat to the grandson occurred the previous evening. H.P. motions the officers inside the home and states:

> You can go in there. He don't have no --- I mean, there's no weapons in there.
> The knife is in the sink. The knife is in the sink and whoever I talked to told me
> to leave the knife alone in the sink and not to touch it. So I didn't.

The State excludes the next four minutes of body camera footage. This footage shows H.P. calmly standing within the home, at times just a couple of feet from Patrick who is calmly answering police questions. At one point H.P. directs Patrick to respond that he is "the second" when police ask his full name. Patrick complies. When an officer indicates he is waiting for another officer to arrive H.P. states, "Okay, we're good. I'm fine. Yes. I'm fine. I just need him out of here and I can take care of everything myself."

The State contends the next fifty seconds of camera footage, from the 5:55 minute mark to the 6:45 minute mark, were admitted into evidence.[5] Therein Patrick discusses that he needs the landlord to allow him to break his lease. H.P. tells Patrick that she already talked to the landlord and Patrick needs to move his belongings out. Patrick responds that he might not be able that day because he needed to go to work. H.P. states that she doubts Patrick will be able to keep his job at a day care "threatening somebody with a knife." H.P. walks out the front door (located in the living room) and Patrick remains within the home. Patrick then states, ""You got me f****d up. The reason I threatened y'all n*****s with a knife is because everybody wants to jump tough on me and I was one versus everybody else. And I'm not going out like that. Period." When Patrick finishes the statement, H.P. opens the door up, looks directly at the officer with the body camera

---

[5] At trial, the State started the footage at the 6:30 minute mark. Therefore, we deem only footage from 6:30 to approximately 6:45 actually admitted into evidence.

8

and states: "That's not how that scenario …." Patrick interrupts and states, "A couple of m***** f****** not wanting to get out of my house …"

The State excludes the next twenty seconds of footage wherein Patrick's dialogue continues: "… and they ain't supposed to be here? They gotta get out, period." H.P. tells police, "That's not how that, he thought someone stole money from him yesterday. That's what the problem was." Patrick states, "They did" and indicates the money was still gone. H.P. replied, "Oh well" and indicates that she was at work and did not steal anything from him.

The State contends the following ten seconds of footage were entered into evidence: Patrick tells police that he could call someone over who could tell them that H.P. stole $300 from him.

The State omits Patrick's explanation immediately thereafter that H.P. had stolen money from him a couple of months prior but Patrick had "gotten over" that because stress was causing him health issues; his recent concern was with someone stealing money from him the day before.

Significantly, the State omits footage starting at approximately fifteen minutes wherein police ask H.P. to *"describe exactly"* how Patrick threatened to kill her. H.P.'s complete statement is: "He just said, Crack Head B***h, I'll kill you." An officer then asks, "Okay, was he holding the knife whenever he said that?" H.P. immediately responds, "No. He done already, when I called the police he put the knife, it was in the room overnight, he just put it in the water. And the, whoever I talked to on the phone told me not to touch it so I didn't." The police then discussed with H.P. the threat to her grandson the day before. H.P. told police that she *was not present* when that threat occurred; she was at work and her family members called her about it. Additional body camera footage shows H.P.'s grandson being interviewed. The grandson denied being threatened with a knife.

9

On May 17, 2017, the court issued a judgment finding Patrick guilty of domestic assault in the third degree pursuant to Section 565.074. The court sentenced Patrick to thirty days in the Boone County Jail, suspending execution of the sentence and placing Patrick on two years of unsupervised probation. This appeal follows.

### Point I – Admission of 911 Recording[6]

In his first point on appeal, Patrick contends that the circuit court abused its discretion in admitting and considering, over Patrick's objection, the 911 recording because it had no probative value and was not properly authenticated. Patrick argues that the State did not offer any competent evidence to identify the other participants in the 911 call who were not the 911 operator, and without this identification the trial court could not reasonably believe that H.P. and the other voices recorded by the call were actual participants in the recording or that the statements made within the recording actually occurred.[7]

"The standard of review for the admission of evidence is abuse of discretion." *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011). The trial court has broad discretion in choosing to admit evidence and we will not disturb this discretion unless it is against the logic of the circumstances and so unreasonable as to show a lack of careful consideration. *State v. Freeman*, 269 S.W.3d 422, 426 (Mo. banc 2008). "For evidentiary error to cause reversal, prejudice must be demonstrated." *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009). "Trial court error is not

---

[6] Although we find Patrick's second point on appeal dispositive, because his second point requires us to review the evidence properly admitted at trial, we address Patrick's first point on appeal as it contends the court erred in admitting the 911 tape.

[7] Patrick objected to the 911 recording at trial on the grounds that the tape had not been authenticated and was inadmissible hearsay. In response to Patrick's claim that the 911 call was hearsay, the State argued that it was admissible because it represented an excited utterance by H.P. On appeal, Patrick does not dispute that portions of the 911 call fell within the excited utterance exception to the hearsay rule.

prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *State v. Forrest*, 183 S.W.3d 218, 224 (Mo. banc 2006).

"For a 911 tape to be admissible, it must clear two hurdles." *State v. McKinney*, 336 S.W.3d 499, 502 (Mo. App. 2011). "'First, the statements must survive traditional hearsay analysis.'" *Id.* (quoting *State v. Bynum*, 299 S.W.3d 52, 59 (Mo. App. 2009)). "'Second, because this is a criminal case, the statements must survive Sixth Amendment Confrontation Clause analysis.'" *Id.*

A proper foundation for the admission of a sound recording consists of:

(1) A showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement.

*State v. Wahby*, 775 S.W.2d 147, 153 (Mo. banc 1989) (internal citations and quotation marks omitted). Patrick concedes that the 911 operator's testimony established the first through fifth and seventh elements for admission of a sound recording. He disputes that the sixth element, identification of the speakers, was met. He argues that although H.P. identifies herself in the recording, the recording is not self-authenticating and cannot be used to meet its own foundational requirements.

Our courts have held that direct evidence confirming a 911 caller's identity is not necessary for "'anonymity is not fatal to the admissibility of the statements once the statements qualify within the exception.'" *State v. Edwards*, 31 S.W.3d 79, 80 (Mo. App. 2000) (quoting *State v. Dunn*, 821 S.W.2d 512, 516 (Mo. App. 1991)). In particular, "anonymity of the speaker is not a bar to admission of an excited utterance where the circumstances of the statement show trustworthiness." *Edwards*, 31 S.W.3d at 79. The identity of the caller may be shown by circumstantial evidence

11

and the subject matter of a phone call can serve as a circumstantial basis to show the identity of the caller. *Id.* at 80. "[C]ircumstantial evidence can point to the identity of the person calling even though the recipient of the call cannot identify the voice." *State v. Gragg*, 606 S.W.2d 252, 254 (Mo. App. 1980).

Here, Patrick does not dispute the trustworthiness of the call or the trustworthiness of the caller's identification of herself within the call; Patrick's sole contention is that the statements should have been excluded because the caller's identification of herself within the call was insufficient to establish her identity so as to meet foundational requirements. We disagree. Within the 911 call the caller identifies herself as Patrick's mother and provides Patrick's full name and birthdate. The caller also identifies herself by name and provides her address and age. Officer Smith testified without objection that he responded to a 911 call at the address provided by the caller, and upon his arrival a woman by the name of H.P. was at that address.[8]

We find sufficient intrinsic circumstantial evidence identifying the 911 caller as H.P. so as to justify the court, in its discretion, to admit relevant portions of the 911 call. Point one is denied.

### Point II – Police Body Camera Footage

In his second point on appeal, Patrick contends that the circuit court abused its discretion in admitting and considering over his objection the body camera footage wherein Patrick states, "The reason I threatened y'all n*****s with a knife is because everyone wanted to jump tough on me and I was one versus everyone else." Patrick argues that the State misstated the evidence when it argued the statement referenced the specific threat to H.P. made during the 911 call. Patrick

---

[8] The State argues that Officer Smith's body camera provides additional circumstantial evidence identifying the 911 caller as H.P. We disagree as the only portion of the body camera footage admitted by the court into evidence was a short statement by Patrick at approximately six minutes and thirty seconds into the video. Nothing within this portion of the video identifies H.P. as the 911 caller.

12

contends that the statement regarding the knife clearly references the previous evening's events which were not part of the charges against him. Consequently, he contends that allowing the uncharged conduct into evidence was highly prejudicial. He argues that without the statement on the body camera, the trial court was left only with the victim's statement on the 911 call, and this was insufficient to justify the judgment of guilt. We agree.

Prior to the State introducing the body camera footage involving Patrick's knife statement, the court indicated it would allow the statement, but anything regarding a knife would not be considered. After the footage was played and the defense again objected, the State argued that Patrick's statement was admissible to show the threat during the 911 call was credible. The State claimed that Patrick had said, "The reason I was threatening *to kill* you all." The State told the court this was a direct admission to Patrick's threat *to kill* H.P. during the 911 call. The State also argued that Officer Smith could testify to hearing Patrick make that statement.[9] The court admitted the evidence.

The State argues on appeal that the evidence shows Patrick "made two distinct threats with a knife," the first occurring the night before and solely involving H.P.'s grandson. The State concedes that the court excluded all evidence regarding this alleged threat. The State contends the second threat was the threat for which Patrick was standing trial. The State reasons:

> While on the phone with the 911 operator requesting that her son be removed from her home, H.P. shouted, 'He just threatened my life! He just threatened to kill me!' Based on Appellant's statement, it was reasonable for the trial court to infer that, even though Appellant had placed the knife in the sink at the time of the threat he made against his mother, he still threatened her life with the knife. Appellant looked directly at his mother and said, 'The reason I threatened ya'll [expletive] with a knife is because everybody wanted to jump tough on me and I was one versus everybody else. And I'm not going out like that. Period.' When the Appellant

---

[9] Officer Smith later testified that he did not know for certain who Patrick was conversing with when he made the statement.

13

> looked at his mother and referenced a threat he made with a knife directed at 'ya'll', that was a reference to a threat leveled at H.P. with a knife. That threat was distinct from the threat directed solely at H.P.'s grandson the night before.

We note that the State never argued at trial that there were two separate threats with a knife.

H.P.'s reason for the 911 call was to report Patrick's alleged knife threat to her adult grandson the previous evening. Patrick's threat *to kill* H.P. happened approximately five minutes and fifteen seconds into the 911 call. The 911 call lasted fourteen minutes fifteen seconds and ended approximately one minute after police arrived. Patrick's *knife* statement occurred five minutes and forty seconds after H.P. ended the 911 call. Hence, the knife statement was made fourteen minutes after Patrick's threat during the 911 call. Before the statement was made, numerous intervening conversations, including that Patrick threatened H.P.'s grandson with a knife, had occurred. As the purpose of H.P.'s call to the police was to report Patrick's knife threat to her grandson, and this knife statement by Patrick was made in the context of that investigation, it cannot reasonably be inferred that this ten-second statement, isolated by the State from twenty-eight minutes of body camera footage, was evidence that Patrick threatened H.P. with a knife during the 911 call.

Further, the State's contention on appeal that Patrick "looked directly at his mother" when making the statement is contrary to the evidence. When the body camera footage admitted by the court begins (six minutes and thirty seconds into the video), H.P. walks out the front storm door of her home (located in the living room) and Patrick remains inside. When Patrick begins his statement, he can be seen walking from the kitchen of the home and into the living room, speaking as he walks. H.P. is still outside with the door closed, although the door contains a window. Patrick does not appear focused on anyone in particular as he walks into the living room; he can be seen looking in the direction of the officer with the body camera during part of the statement. Nothing

14

within the video footage, however, shows Patrick looking directly at H.P. who remains outside and not in view of the camera. H.P.'s grandson, whom Patrick allegedly threatened with a knife the night before, is sitting on a couch approximately three feet to the right of where Patrick comes to a stop in the living room.

The State misstated the evidence when arguing for its admission at trial. Nothing within the body camera footage admitted by the court, or the portions of the 911 tape admitted by the court, support a reasonable inference that Patrick's knife statement referenced the 911 threat. The only way such an inference can be drawn is if the isolated pieces of body camera footage the State contends were admitted *after trial* are considered. Even then, such an inference can only be drawn if the isolated pieces of body camera footage are viewed out of context.

The State isolates the knife statement but excludes H.P.'s contemporaneous explanation that Patrick thought someone stole money from him "yesterday" -- the same day as the alleged threat against the grandson. While the State argues that Patrick "looked directly at his mother" when making the statement, the body camera footage does not support this. The State isolates ten seconds of footage wherein Patrick accuses H.P. of stealing from him, perhaps to supply a motive for the 911 threat, but excludes Patrick's explanation immediately thereafter that he had moved past that theft. While insisting on the relevancy of the knife statement to the 911 threat, the State completely ignores and omits H.P.'s statement that she was not threatened with a knife during the 911 threat.[10]

---

[10] "The prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in a case, including the police, because it is the prosecutor's duty to learn of such evidence." *State v. Smith*, 491 S.W.3d 286, 298 (Mo. App. 2016) (internal quotation marks and citations omitted). Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), "due process is violated where the State fails to disclose evidence in its possession which is favorable to the accused and is material with respect to either guilt or punishment." *Id.* Where the State argued that Patrick's statement regarding the knife was relevant and added credibility to the threat during the 911 call, in fairness, the court should have also been informed of H.P.'s specific statements describing the threat.

Moreover, as discussed above, the additional body camera footage the State claims was admitted into evidence was never admitted during trial; the isolated ten to fifteen seconds of footage that was admitted is insufficient to support the State's claim that Patrick was referencing H.P. during the knife statement.[11] The circuit court abused its discretion when it admitted this statement into evidence.

Our analysis does not end here. Patrick is not entitled to reversal unless the erroneous admission of evidence was prejudicial. This was a court-tried case. "In court-tried cases judges are given great latitude in the admission of evidence because of the presumption that they will not give weight to incompetent evidence." *Worthington v. State*, 166 S.W.3d 566, 573 (Mo. banc 2005). "Erroneous admission of such evidence constitutes harmless error if other properly admitted evidence supports the judgment." *Id.*

The State argues that, even if Patrick's knife statement was referencing the previous, uncharged threat and the trial court erred in admitting and considering the statement, Patrick would not be entitled to reversal because the evidence was cumulative as all elements of the charged offense were established through Officer Smith's testimony, the 911 call, and other portions of the body camera footage. We disagree.

The State charged Patrick with the class A misdemeanor of domestic assault in the third degree for purposely placing H.P., a family or household member, in apprehension of immediate physical injury by threatening to kill her. The State, therefore, had the burden of proving H.P. and

_____

[11] "[T]he general rule of completeness is violated [] when admission of the statement in an edited form distorts the meaning of the statement or excludes information which is *substantially* exculpatory to declarant." *State v. Ellis*, 512 S.W.3d 816, 827-828 (Mo. App. 2016) (internal quotation marks and citations omitted) (emphasis in original). Here, defense counsel made no request for admission of a more complete statement as the defense contended that the entire body camera footage, with the exception of footage that might have explained subsequent police conduct, was inadmissible.

Patrick were family or household members, Patrick intended to place H.P. in apprehension of immediate physical injury when he stated he would kill her, and Patrick actually placed H.P. in apprehension of immediate physical injury when he stated he would kill her. § 565.074; *J.D.B. v. Juvenile Officer*, 2 S.W.3d 150, 153 (Mo. App. 1999). The family/household member element is not in dispute.

## Officer Smith's Testimony

Officer Smith testified to three things. First, he testified that H.P. was crying and upset upon his arrival to her home. Second, he introduced the body camera footage. Third, he testified that he did not know for certain who Patrick was speaking to when he made the statement regarding the knife.

Obviously, Smith's eye-witness testimony regarding Patrick's knife statement does not corroborate the State's claims. As to H.P.'s demeanor, Officer Smith's testimony that H.P. was upset and crying upon his arrival is insufficient by itself to support an inference that H.P. feared immediate physical harm from Patrick's statement or that Patrick intended to place H.P. inapprehension of immediate physical injury when he stated he would kill her.[12] There was no follow-up testimony regarding H.P.'s appearance and demeanor, and no evidence that Officer Smith ever discussed with H.P. the specific reason she appeared upset. H.P. had called officers to the home on a completely different matter.

---

[12] Officer Smith's body camera footage (a portion the State claims was admitted at trial) shows H.P. calmly speaking with the 911 operator when police arrive. H.P. calmly asks the 911 operator if she can end the call due to the arrival of police. While H.P. becomes visibly emotional when referencing a son killed in a car accident three years prior, nothing within the portions of the video purportedly admitted by the State suggest that H.P.'s emotion can be attributed to an apprehension of immediate physical injury caused by Patrick's threat.

## 911 Tape

Six minutes and forty seconds of H.P.'s 911 call, excluding evidence subject to sustained objections, were admitted into evidence. The call includes H.P. shouting: "He just threatened my life! He just said he is going to kill me!" While it could be argued that the rise in H.P.'s voice evinces an apprehension of immediate physical harm, H.P. uses this same elevated voice at the outset of the call when reporting Patrick's alleged behavior toward her grandson the prior evening. Early in the call, however, she tells the operator that no one is in immediate danger. While H.P.'s voice is elevated when reporting Patrick's threat, H.P. calmly speaks with the 911 operator thereafter and H.P. remains in the home with Patrick rather than attempting to leave. H.P. also demands, "Come and get him, please," and states, "F**k this s**t," evincing anger rather than fear. H.P. was never asked during the 911 call whether she feared immediate physical harm. Although asked by the 911 operator to separate herself from Patrick, H.P. prioritized putting a wig on her head over exiting the home.

There was no evidence presented at trial that H.P. believed Patrick to have the ability, means, or intent to carry out that threat, and H.P.'s behavior immediately after the threat suggests otherwise. H.P. did not testify at trial and Patrick did not testify at trial. It can be inferred from the 911 tape that one of the men speaking in the background is Patrick because H.P. asks the 911 operator if she hears "him." As H.P. asks bystanders to call "Deanie" because Patrick threatened to kill her, someone can be heard saying, "ain't gonna kill nobody," and someone can be heard yelling, "I'm leaving!" These conversations occur within the forty seconds of the threat.

Without more, the contents of the 911 tape do not support a reasonable inference that H.P. was in apprehension of immediate physical harm by the threat, or that Patrick intended to place H.P. in apprehension of immediate physical harm when making the threat.

18

**Body Camera Footage**

Although the State contends that "other portions of the body camera footage" help establish the elements of the charged offense, the only portion of the body camera footage admitted at trial was the statement regarding the knife. As this footage was inadmissible, there is no body camera footage to support that H.P. was in apprehension of immediate physical harm by the threat, or that Patrick intended to place H.P. in apprehension of immediate physical harm when making the threat.

Moreover, we find the evidence properly admitted at trial insufficient to prove beyond a reasonable doubt that Patrick intended to place H.P. in apprehension of immediate physical injury when he said he would kill her during the 911 call, or that Patrick actually placed H.P. in apprehension of immediate physical injury at the time of the statement. Patrick was, therefore, prejudiced by the court's admission of the body camera evidence. If perceived as an admission by Patrick that he threatened H.P. with a knife when he said he would kill her during the 911 call, this would support inferences that a reasonable person would fear immediate physical injury from such threat, and that Patrick intended to place H.P. in apprehension of immediate physical harm when making the threat. Without these inferences, the evidence is insufficient to support the judgment.

Patrick's second point on appeal is granted.

**Conclusion**

We conclude that the circuit court did not abuse its discretion in admitting the 911 tape over Patrick's objection as there was sufficient intrinsic circumstantial evidence identifying the 911 caller as H.P. to allow the court, in its discretion, to admit the evidence. We conclude that the circuit court abused its discretion in admitting police body camera footage of Patrick making a statement regarding a knife. No reasonable inference can be drawn from the isolated statement that it was in reference to Patrick's alleged crime. As the evidence properly admitted at trial was

19

insufficient to support a conviction for domestic assault in the third degree pursuant to Section 565.074, the court's error was not harmless.

The circuit court's judgment is reversed, and Patrick's conviction and sentence are vacated.

_____
Anthony Rex Gabbert, Judge

Judge Pfeiffer concurs in the majority.
Judge Mitchell concurs and dissents in a separate opinion.

20



# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) |
| | )   **WD80777** |
| v. | ) |
| | )   **OPINION FILED:** |
| | )   **January 8, 2019** |
| DERRICK R. PATRICK, | ) |
| | ) |
| Appellant. | ) |

## <u>CONCURRING AND DISSENTING OPINION</u>

While I concur with the majority's decision regarding admissibility of the 911 tape, I disagree with its determination regarding admissibility of the body cam footage. Because I believe the body cam footage was both relevant and admissible, I respectfully dissent from the majority's holding with respect to Patrick's second point on appeal.

In his second point on appeal, Patrick argues that the trial court erred in admitting the body cam footage, including his alleged admission, because it was irrelevant and highly prejudicial insofar as it referred to an uncharged bad act—specifically, an alleged threat made by Patrick against Victim's grandson the night before.

"The standard of review for the admission of evidence is abuse of discretion." *State v. Williams*, 420 S.W.3d 713, 721 (Mo. App. W.D. 2014) (quoting *State v. Peal*, 393 S.W.3d 621,

625 (Mo. App. W.D. 2013)). "A trial court has broad discretion to admit or exclude evidence at trial." *Id*. (quoting *Peal*, 393 S.W.3d at 625). "The trial judge is also in the best position to weigh the probative value of the evidence against its prejudicial effect." *Id*. (quoting *Peal*, 393 S.W.3d at 625). "Abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id*. (quoting *Peal*, 393 S.W.3d at 625). Reversal is not warranted unless the error is so prejudicial that it deprived the defendant of a fair trial. *Id.* "Trial court error is not prejudicial unless there is a reasonable probability that it affected the outcome of the trial." *Id*.

"[P]roof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial." *State v. Vorhees*, 248 S.W.3d 585, 587 (Mo. banc 2008), *superseded in part on other grounds by constitutional amendment*, Missouri Constitution, article 1, section 18(c), (quoting *State v. Reese*, 274 S.W.2d 304, 307 (Mo. banc 1954)). "There are a number of exceptions to the general ban on evidence of prior criminal acts"; they include "(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other tha[t] proof of one tends to establish the other; and (5) the identity of the person charged with the commission of the crime on trial." *Id*. at 588.

The majority concludes that Patrick's alleged admission in the body cam footage was inadmissible evidence of other crimes because it referred to only the alleged threat levied against Victim's grandson the night before and not to the threat underlying the charge for which Patrick was convicted. But this analysis overlooks the fact that Patrick's statement—"The reason I threatened *y'all n\*\*\*\*\*s* with a knife is because *everyone* wanted to jump tough on me and I was one versus *everyone else*"—clearly refers to multiple people and not just Victim's grandson.

2

(Emphasis added.) As such, though it may refer to the threat made against the grandson, as the majority concludes, there is no basis to assume that it did not also refer to the threat Patrick had just made against Victim. The question of to whom Patrick's statement was addressed is a factual one that demands our deference to the trial court. And when we view the facts in the light most favorable to the prosecution, as we must,[1] it appears that the trial court determined that this statement referred, at least in part, to the threat against Victim because viewing his statement this way is the view that is the most favorable to the prosecution. In other words, viewing Patrick's statement as an admission that he threatened Victim supports the inferences necessary to support the verdict—specifically, that a reasonable person would fear immediate physical injury from the threat and that Patrick intended to place Victim in apprehension of immediate physical harm when making the threat. Viewing Patrick's statement in any other way is contrary to both the verdict and our standard of review. When reviewed under the proper standard, it is undeniable that Patrick's statement was both relevant and admissible.

But even if viewed as referring solely to the threat made against Victim's grandson, the statement still would have been admissible to establish Patrick's motive and intent when threatening Victim. The fact that Patrick threatened a household member in the same manner fewer than twenty-four hours earlier, and apparently in response to the same issue (who was entitled to reside at the house), goes directly to the question of whether he intended to place Victim in apprehension of immediate physical injury when threatening to kill her during the 911 call. Thus, it falls squarely within an exception to the bar on admission of prior bad acts evidence.

---

[1] *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), *superseded on other grounds by statute*, 28 U.S.C. § 2254(d).

For these reasons, I would affirm the trial court's ruling on the admissibility of the body cam footage. Therefore, I respectfully dissent from the majority's conclusion that the evidence was inadmissible.

Karen King Mitchell, Chief Judge