

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD81763 |
| | ) | |
| v. | ) | OPINION FILED: June 25, 2019 |
| | ) | |
| JAFARI R. BOSS, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Boone County, Missouri**
The Honorable Christine Carpenter, Judge

Before Division Two: Thomas N. Chapman, Presiding Judge, Mark D. Pfeiffer, Judge
and Cynthia L. Martin, Judge

Jafari Boss ("Boss") appeals from the trial court's entry of judgment convicting him of seven counts of robbery in the first degree, seven counts of armed criminal action, and one count of unlawful use of a weapon. Boss claims (1) the trial court erred in overruling a motion to exclude evidence including a gun found in a backpack and ballistics conclusions relating to that gun because the State failed to timely disclose the evidence; (2) the trial court erred in admitting the testimony of a ballistics expert because the admission

of the testimony violated section 490.065[1]; and (3) the trial court erred in admitting testimony that Boss had been kicked out of his hotel room because the testimony was inadmissible character and propensity evidence. We affirm the trial court with regard to Boss's arguments on appeal, and remand on the limited basis to correct the written judgment to reflect the trial court's oral pronouncement and sentencing.

## Factual and Procedural Background[2]

On October 29, 2014, Boss entered the LaQuinta Inn located in Columbia, wearing a plastic mask and carrying a .45-caliber pistol. Boss held the overnight employee at gunpoint and directed the employee to retrieve money in the hotel's cash drawer, before fleeing the hotel. This robbery was the first of a series of seven armed robberies that Boss committed in October and December of 2014.

In December, Boss, with the assistance of others, robbed another hotel, the Budget Host Inn; two convenience stores, the Speedy Mart and We B Smokin'; and three restaurants, Jimmy John's, China Moon, and Denny's. During the commission of the robbery at Denny's, a single round was fired into the restaurant's ceiling from a handgun. A .45-caliber shell casing was recovered by police. After the robbery at China Moon, a restaurant employee told police the gunman had been carrying a handgun with the word "Model" written on it.

---

[1]All statutory references are to RSMo 2016, as amended through the date of the trial, unless otherwise noted.

[2]On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict. *State v. Rice*, 504 S.W.3d 198, 200 n. 3 (Mo. App. W.D. 2016).

On December 17, police responded to calls about a possible robbery and shots fired in an alleyway behind a strip mall near the Columbia Mall. Police discovered damage to the strip mall building consistent with the discharge of a firearm. Police also recovered a .45-caliber shell casing from the alleyway. Boss was apprehended walking near the strip mall. Several weeks later, a backpack that had been hidden under a porch at an apartment complex near the strip mall was discovered. The backpack contained a .45-caliber handgun with the word "Model" written on it. Boss's DNA was discovered on items in the backpack.

Boss was charged by information on multiple counts of robbery in the first degree, kidnapping, and armed criminal action. A jury trial was set for December 5, 2017. On November 15, 2017, the State disclosed evidence relating to the gun found in the backpack, including ballistics laboratory reports that had been prepared by the Missouri Highway Patrol ("Highway Patrol"). Boss filed a Motion to Exclude ("Motion") any evidence or witnesses regarding the gun and ballistics reports compiled by the Highway Patrol based on the late disclosure of the evidence. During a pretrial hearing on November 29, 2017, the trial court overruled Boss's Motion.

On December 1, 2017, the State filed a superseding indictment, charging Boss with seven counts of robbery in the first degree, seven counts of armed criminal action, and one count of unlawful use of a firearm.[3] On December 4, 2017, Boss's counsel's requested a continuance to prepare for additional charges filed in the superseding indictment. The

---

[3]The charge of unlawful use of a firearm related to the December 17, 2014 firing of a weapon in the alleyway behind the strip mall.

3

continuance request was granted.[4]  Boss was tried by jury in early February 2018.  Prior to trial, Boss re-asserted his Motion.  The Motion was denied the day trial began.

At trial, the State admitted the gun found in the backpack without Boss's objection, though he earlier objected unsuccessfully to admission of a photograph of the gun. Highway Patrol Officer Jason Crafton ("Crafton") testified as a firearm and tool mark expert without objection.[5]  Other evidence, including cartridges and photographs used during the ballistics testing, were admitted over Boss's objection.  Crafton concluded from examination of the gun and shell casings recovered at Denny's and in the alleyway of the strip mall that the gun found in the backpack was used to discharge the round in both locations.

Terrence Harvey testified that he participated in four of the seven robberies with Boss.  Harvey also testified that he and Boss had been denied lodging at the LaQuinta Inn on December 8, 2014.  Corroborating Harvey's testimony, a LaQuinta Inn manager testified that she denied Boss lodging on that date.  The LaQuinta Inn manager testified that she decided to deny Boss a room after a discussion with a co-employee who had been working when the LaQuinta Inn was robbed on October 29, 2014.  Other testimony also established that Boss had stayed at the Budget Host Inn for several months, before being asked to leave before the University of Missouri-Columbia's homecoming weekend.

---

[4]Boss, appearing in person, expressed his desire to continue with the jury trial set for December 5.

[5]Crafton's testimony was challenged as improper expert testimony, an issue we address in Point Two on appeal.

4

The jury convicted Boss on all counts included in the superseding indictment. The trial court sentenced Boss, as a prior and persistent offender, to 90 years imprisonment.[6]

Boss timely appeals.[7]

## Analysis

Boss asserts three points on appeal. Boss's first point argues that the trial court erred in admitting the gun found in the backpack and ballistics conclusions relating to that gun because the State failed to disclose that evidence in violation of Rule 25.03.[8] Boss's second point asserts the trial court erred in overruling Boss's objections to the testimony of Crafton because the testimony violated section 490.065's standards of admissibility for expert witness testimony. Boss's third point asserts the trial court erred by overruling Boss's objection to evidence that Boss had been denied and kicked out of hotel rooms. We address each point in turn.

## Point One

Boss's first point asserts the trial court erred in admitting into evidence the gun found in the backpack and ballistics conclusions relating to that gun in violation of Rule 25.03

---

[6]Boss was sentenced to twenty years' imprisonment on each robbery conviction; ten years' imprisonment on each armed criminal action conviction; and fifteen years' imprisonment on the unlawful use of a weapon conviction. The robbery sentences were to run concurrently to each other robbery conviction, but consecutively to each armed criminal action conviction. The armed criminal action sentences were to run consecutive to each other armed criminal action sentence, while the unlawful use of a weapon sentence was to run concurrently with all other sentences.

[7]Additional facts will be discussed as relevant.

[8]All rule references are to *Missouri Court Rules, Volume I—State, 2017,* as applicable at the time of disputed disclosure in November 2017, unless otherwise indicated.

because the evidence was not disclosed by the State until November 15, 2017 and the late disclosure prevented defense counsel from having sufficient time to prepare.[9]

In reviewing discovery violations under Rule 25.03, we must determine: "first, whether the State's failure to disclose the evidence violated Rule 25.03, and second, if the State violated Rule 25.03, then what is the appropriate sanction the trial court should have imposed." *State v. Clark*, 486 S.W.3d 479, 484 (Mo. App. W.D. 2016). "Review is for abuse of discretion." *Id.* (citing *State v. Wolfe*, 13 S.W.3d 248, 259 (Mo. banc. 2000)). "The trial court has discretion to impose sanctions for discovery violations under Rule 25.03." *Id.* "[The] denial of a requested sanction is an abuse of discretion only where the admission of the evidence results in fundamental unfairness to the defendant." *State v. Taylor*, 298 S.W.3d 482, 502 (Mo. banc 2009). "Such fundamental unfairness exists if there is a reasonable likelihood that the failure to disclose the evidence affected the result of the trial." *Id.* (internal quotes omitted).

Rule 25.03(A) provides that the State "shall, upon written request of defendant's counsel, disclose to defendant" material and information within its possession or control as designated in the request. Included among the information and material that the State is required to disclose are "any reports or statements of experts, made in connection with the particular case, including results . . . of scientific tests, experiments, or comparisons." Rule 25.03(A)(5). Rule 25.03(C) provides:

> If the defense in its request designates material or information which would be discoverable under [Rule 25.03] if in possession or control of the state,

---

[9]Boss does not assert that the November 2017 disclosure was a *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

but which is, in fact, in the possession or control of other governmental personnel, the state shall use diligence and make good faith efforts to cause such materials to be made available to the defense counsel . . .

This rule "imposes an affirmative requirement of diligence and good faith on the state to locate records not only in its own possession or control but also in the control of other government personnel." *State v. Steidley*, 533 S.W.3d 762, 772 (Mo. App. W.D. 2017).

Boss's point on appeal asserts the trial court erred "in admitting the gun found in the backpack and ballistics conclusions relating to that gun." The State argues that Boss's claim of error is only partially preserved because although Boss objected to admission of some of the evidence used to reach the ballistics conclusion (such as cartridges and photographs) he did not object to admission of the gun itself, or to the testimony of Crafton about the "ballistics conclusions."[10] The partial preservation of some, but not all, of Boss's claim of error need not be further addressed, however, as the trial court did not commit error in denying Boss's Motion and in admitting the gun and ballistics conclusions, plain or otherwise.

Here, among numerous other discovery requests, Boss requested all lab reports relating to Boss's arrest and charges. In response to those requests, the State disclosed all reports it had been provided by the Columbia Police Department and Highway Patrol.

The State and defense counsel met in November 2017 to review the physical evidence that might be introduced at trial. During the review of this evidence, the parties

---

[10]Boss's discussion of the nature of the "ballistics conclusion" is scant and the record is not clear what evidence was disclosed on November 15th. Nonetheless, we understand Boss's argument to refer to conclusions provided in Crafton's testimony relating to the Denny's shell casing and the shell casing recovered from the strip mall alleyway.

7

jointly discovered information referring to additional ballistics testing that had been conducted under a different police report number. The State contacted the Columbia Police Department and the Highway Patrol to retrieve the relevant reports, which had been catalogued by those departments under a different report number. On November 15, 2017, the State disclosed this additional evidence to Boss, which included the ballistics conclusions relating to the gun found in the backpack. The trial court denied Boss's Motion to exclude this evidence based on a purported violation of Rule 25.03 because it found that the State had exercised diligence and good faith in making the disclosures. The trial court's conclusion is not an abuse of discretion, given the explanation for the late disclosures.

Even if a violation of Rule 25.03 had occurred when the State made late disclosures in November 2017, the trial court effectively afforded Boss an appropriate remedy to ensure that he was not unfairly prejudiced by the State's late disclosures. "The trial court is in the best position to assess the prejudicial effect of the failure to disclose and to determine what remedy was necessary to alleviate any unfairness." *State v. Petty*, 967 S.W.2d 127, 137 (Mo. App. E.D. 1998). "Trials are truth-seeking procedures and exclusion of relevant evidence is not favored." *Taylor*, 298 S.W.3d at 502 (holding that a trial court did not err by admitting evidence relating to test results disclosed shortly before trial when the record did not reveal the State's bad faith and the defendant was provided additional time for discovery and to prepare on account of the disclosure).

Here, after Boss's Motion was denied, Boss sought and was granted a two-month continuance to adequately prepare for new charges raised in a superseding indictment. Though the continuance was sought by Boss for a reason unrelated to the Motion, the effect

8

of the continuance was to afford Boss the fundamental fairness that our adversary system aims to provide.[11] *Clark*, 486 S.W.3d at 485 (Mo. App. W.D. 2016) (reasoning that the purpose of the "discovery process in criminal proceedings is to permit [the] defendant a decent opportunity to prepare in advance of trial and avoid surprise, thus extending to [a defendant] fundamental fairness which the adversary system aims to provide").

The trial court did not abuse its discretion in overruling Boss's Motion.

Point One denied.

## Point Two

Boss asserts the trial court erred in admitting the testimony of Crafton in violation of section 490.065 because Crafton's expert testimony was not shown to be a product of reliable principles and methods.

"A trial court's decision regarding the exclusion or admissibility of evidence is reviewed for an abuse of discretion." *State v. Blurton*, 484 S.W.3d 758, 769 (Mo. banc 2016). "[W]e will not disturb this [broad] discretion unless it is against the logic of the

---

[11]Boss relies on *State v. Greer*, 62 S.W.3d 501 (Mo. App. E.D. 2001). *Greer* is unavailing. In *Greer*, the defendant was prejudiced when the State failed to disclose statements of a witness. *Id.* at 504. The defendant first learned of the witness's statements when the witness provided her testimony at trial. *Id.* The witness' testimony rebutted defendant's evidence and undermined defendant's central defense. *Id.* at 505. The trial court denied defendant's motions for a mistrial or to strike the witness's statements, and the defendant was convicted. *Id.* The Eastern District held that a fundamental unfairness occurred when defendant was genuinely surprised at learning the testimony of the witness at trial. *Id.* at 505-06. Here, the ballistics evidence was disclosed two weeks before Boss's initial trial date, and ultimately, two and a half months before Boss's trial.

Had Boss believed himself unduly prejudiced by the denial of his Motion, then it would be reasonable to believe that he would have sought a continuance of the trial setting ***because*** of the denial, in order to afford himself time to prepare to respond to the "newly discovered evidence." He did not do so. That, coupled with Boss's failure even now to point to any additional testing or analysis of an exculpatory nature that he might have been able to perform had he been given time to do so further support the conclusion that Boss suffered no fundamental unfairness as a result of the State's purported untimely disclosure of the late discovered ballistics related evidence.

9

circumstances and so unreasonable as to show a lack of careful consideration." *State v. Patrick*, 566 S.W.3d 245, 253 (Mo. App. W.D. 2019).

Section 490.065 governs the admissibility of expert witness testimony. The statute was amended effective August 28, 2017 to create new standards for the admissibility of expert testimony. Section 490.065.2, which applies to criminal cases, models Federal Rules of Evidence, Rules 702 through 705. Section 490.065.2 provides that in criminal cases:

> (1) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case[.]

Because section 490.065.2 models the Federal Rules of Evidence, "we are guided by existing and still applicable Missouri law and the federal jurisprudence on this matter, including the seminal case of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)." *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 312 (Mo. App. E.D. 2018) (application for transfer denied December 18, 2018). Under the amended version of section 490.065, "trial courts must act as gatekeepers to ensure that the testimony sought to be admitted . . . 'is not only relevant, but reliable.'" *Id.* (quoting *Daubert*, 509 U.S. at 589).

10

Boss claims error only with respect to the requirement for admission described in section 490.065.2(1)(c). Boss asserts that "Crafton's expert testimony was not shown to be the product of reliable principles and methods." Boss raised this issue by pretrial motion. Boss claims that the State failed to provide evidence during a pretrial evidentiary hearing "that each firearm imparts unique individual characteristics tool marks onto projectiles and casings." [Appellant's Brief, p. 27]. We disagree.

Our courts have recognized that reliability, under section 490.065.2, is determined by many factors. *Wright*, 562 S.W.3d at 317. These factors of reliability may include those discussed in *Daubert*. *Id.* *Daubert* factors include (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential error rate of the technique or theory when applied and the existence and maintenance of standards and controls; (4) whether the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. Our courts have recognized that the inquiry about admissibility is intended to be flexible and that "other factors may also be relevant." *Wright*, 562 S.W.3d 318-19. "No single factor is necessarily dispositive of the reliability of a particular expert's testimony." *Id.*

Here, during the pretrial hearing to determine the admissibility of Crafton's testimony, Crafton testified that he has been a certified firearms examiner through the Association of Firearm and Tool Mark Examiners ("AFTE") for at least 15 years; that he sat on the editorial board of the AFTE Journal, which publishes peer-reviewed firearm and tool mark examination studies; that firearm and tool mark identification was a science; that

11

numerous studies had been conducted demonstrating the validity of AFTE's theory of identification; that firearm and tool mark identification has been utilized for nearly a century with the use of comparison microscopes; that AFTE's theory of identification requires the comparison of tool marks, which are caused by "two surfaces coming together" and the harder of the two surfaces marking the softer surface. Crafton testified that no study has ever falsified AFTE's theory of identification.

Crafton further testified that tool marks create detailed patterns that include peaks, ridges, and furrows; that these patterns are characteristic based on height, width, depth, spatial relationship, curvature, consecutiveness; that certain characteristic patterns may be defined as class, subclass, and individual characteristics; that a class characteristic is a measurable or general feature that is imparted on an object and intended by the manufacturer, such as caliber or twist of direction of rifling inside of a barrel; that subclass characteristics are microscopic marks that are imparted onto an object by a tool and are not intended by the manufacturer; and that individual characteristics are random imperfections of a tool's working surface that are imparted onto the object that it's making, which might include the process of manufacturing, the use, or wear and tear of a marking tool. Crafton testified that when he compares these characteristics, he looks for "sufficient agreement," which means that the comparison "exceeds the best known agreement between two marks that [Crafton] ha[s] seen that have been made by different tools and [are] consistent between two tool marks that [he] know[s] have been made by the same tool."

Crafton testified that he first compares class characteristics under a microscope when comparing two objects like different shell casings. If the class characteristics

12

sufficiently agree, then Crafton compares the subclass characteristics. If the subclass characteristics agree, then Crafton continues to compare the individual characteristics to arrive at a final conclusion as to whether the compared objects are a "match," referred to in the industry as an "identification." If the individual characteristics sufficiently agree, then Crafton concludes that the shell casings were fired from the same firearm.[12] If Crafton reaches the conclusion that the objects under comparison are not a "match," or an "identification," another firearm and tool mark examiner peer-reviews Crafton's comparison. Crafton testified that the Highway Patrol has an error rate of zero to 4 percent.

Crafton further testified that published peer-review studies have suggested the AFTE theory of identification is reliable. Crafton testified regarding a study that involved 7,500 comparisons conducted by more than 500 examiners throughout 20 countries, which did not produce a single false-positive identification.

Crafton's testimony demonstrated that the AFTE theory of identification, which he used while testing the shell casings found in the strip mall alleyway and at Denny's, was sufficiently reliable under section 490.065.2. This conclusion is supported by the considerable weight of authority, which has held firearm and tool mark identification admissible under the *Daubert* standards of admissibility. *See United States v. Otero*, 849 F. Supp.2d 425, 437-48 (D.N.J. 2012) (holding that expert testimony based on AFTE's theory of identification was a product of reliable methodology, even though expert's testimony did involve "some degree of subjective analysis and reliance upon the expertise

---

[12]Crafton also testified that he may also conclude that the comparison was an elimination, inconclusive, or unsuitable.

and experience of the examiner"); *see also United States v. Ashburn*, 88 F.Supp.3d 239, 245-48 (E.D.N.Y. 2015); *United States v. Casey*, 928 F.Supp.2d 397, 399-400 (D.P.R. 2013); *United States v. Hicks*, 389 F.3d 514, 525-26 (5th Cir. 2004).

Boss nonetheless challenges the reliability of Crafton's conclusions on the basis of a 2009 National Research Council Report, which "calls into question the validity of the assumptions about tool marks that underlie firearms identification." [Appellant's Brief, p. 27]. Boss was free "to challenge [] [Crafton's] conclusions and point out the weaknesses of [Crafton's] analysis to the jury during cross-examination," on the basis of this report. *United States v. Davis*, 103 F.3d 660, 674 (8th Cir. 1996). However, "[w]eight and credibility are the province of the jury." *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

Because the State adduced pretrial evidence to demonstrate that Crafton's testimony was a product of reliable principles and methods under section 490.065.2, the trial court did not abuse its discretion in admitting Crafton's expert testimony regarding ballistics conclusions.

Point Two denied.

**Point Three**

Boss argues the trial court erred in overruling Boss's objection to evidence that he had been denied lodging at LaQuinta Inn on December 8, 2014 and that he had been asked to leave the Budget Host Inn in October 2014 because this testimony implied that Boss

14

"was a person who had committed uncharged crimes." Boss asserts that this evidence was "inadmissible character and propensity evidence."

As already mentioned, we review the admission or exclusion of evidence for an abuse of discretion. *Blurton*, 484 S.W.3d at 769. The State asserts that although Boss preserved his claim of error regarding the Budget Host Inn testimony, he failed to preserve his claim of error relating to the LaQuinta Inn manager's testimony because his objection at trial was untimely. Once again, we need not address whether Boss fully preserved this claim of error on appeal, as the trial court did not err, plain or otherwise, when it permitted the admission of testimony that Boss was denied lodging at the LaQuinta Inn and asked to leave the Budget Host Inn in anticipation of the University of Missouri-Columbia's homecoming weekend.

Character evidence and propensity evidence "are distinct from each other." *State v. Shockley*, 410 S.W.3d 179, 193 (Mo. banc 2013). Character evidence does not involve "proof of specific prior instances of conduct, but constitutes evidence that concerns a person's reputation, such as whether someone in the defendant's community views the defendant as a law-abiding citizen, a peaceable person, a truthful person, or as having any other general character trait." *Id.* While "[p]ropensity evidence is 'evidence of uncharged crimes, wrongs, or acts' used to establish that [a] defendant has a natural tendency to commit the crime charged." *Id.* (quoting *State v. Bernard*, 849 S.W.2d 10, 13, (Mo. banc 1993)). "[Propensity evidence] is evidence of specific and distinct prior acts." *Id.*

Here, the Budget Host Inn manager's testimony made no reference to Boss's character, or to his prior criminal behavior, either charged or uncharged, and was instead

15

adduced in the context that Boss was asked to leave the hotel after a multiple-month stay to accommodate the high volume of guests who would be arriving for the University of Missouri-Columbia's homecoming. The Budget Host Inn manager's testimony that Boss was asked to leave the hotel did not constitute character or propensity evidence.

The LaQuinta Inn manager's testimony did vaguely reference alleged prior misconduct when the manager explained that she decided not to rent a room to Boss on December 8, 2014 because of a conversation with a co-employee who had been present during a robbery of the same LaQuinta Inn on October 29, 2014. The manager did not testify that the co-employee expressly implicated Boss in the prior, uncharged, robbery. However, the arguable inference was that he might have been involved in that robbery.

This arguable inference, however, is at best a vague reference to misconduct. "Vague references are not clear evidence of associating a defendant with other crimes." *State v. Harris*, 156 S.W.3d 817, 824 (Mo. App. W.D. 2005). Additionally, evidence of uncharged conduct that is "part of the circumstances or the sequence of events surrounding the offense[s] charged" may be admissible "to present a complete and coherent picture of the events that transpired." *State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994). The vague reference here, even if an improper reference to uncharged misconduct, was not so prejudicial as to outweigh the independent probative value of the LaQuinta Inn manager's testimony, which placed Boss within a block of the We B Smokin convenience store on the date it was robbed.[13]

---

[13]The manager's testimony also corroborated testimony provided by Terrence Harvey, who participated in four of the seven charged robberies.

The trial court did not abuse its discretion by admitting the Budget Host Inn and LaQuinta Inn managers' testimony.

Point Three is denied.

**Written Judgment Inaccuracies**

Though our denial of all of Boss's points on appeal requires us to affirm the trial court's judgment, we have nonetheless determined it necessary to exercise our authority, *sua sponte*, to address a clerical error in the trial court's written judgment. *See State v. Parsons*, 409 S.W.3d 486 (Mo. App. W.D. 2013).

The jury convicted Boss of fifteen counts, including Count 11 (the class A felony of robbery in the first degree); Count 12 (the unclassified felony of armed criminal action); Count 13 (the class A felony of robbery in the first degree); and Count 14 (the unclassified felony of armed criminal action). The written judgment, however, mistakenly reflects that Boss was convicted of Count 11 for the class A felony of kidnapping; of Count 12 for the class A felony of robbery in the first degree; of Count 13 for the unclassified felony of armed criminal action; and of Count 14 for the class A felony of kidnapping. The written judgment form inaccurately reflects the actual judgment rendered with respect to these Counts.

"The error on the judgment form is a clerical error, which is clearly discernable from the record." *State v. Allison*, 326 S.W. 3d 81, 95 (Mo. App. W.D. 2010). "As such there is a basis to support the amendment of the judgment *nunc pro tunc* in order to correctly reflect [Boss's] convictions." *Id.*; *see* Rule 29.12(c). The clerical error on the written judgment form should be corrected to reflect the actual judgment rendered by the trial court "but not

17

carried into or properly recorded in the record." *Allison*, 326 S.W.3d at 95. "Accordingly, this is a proper circumstance . . . for an order *nunc pro tunc* correcting the written judgment to reflect what actually occurred." *State v. Bjorgo*, 571 S.W.3d 651, 661 (Mo. App. W.D. 2019).

This matter is remanded with instructions for the trial court to enter a nunc pro tunc judgment to correct the crimes of which Boss was actually convicted on Counts 11 through 14.

## Conclusion

The trial court's judgment is remanded for the limited purpose of correcting clerical mistakes in the written judgment form so that Counts 11 through 14 reflect the judgment actually rendered. The trial court's judgment is affirmed in all other respects.


_____
Cynthia L. Martin, Judge


All concur

18